**Grace WILSON, Plaintiff,**

v.

**SOUTHERN NATIONAL BANK OF NORTH CAROLINA, INC., Defendant.**

**No. 3:93–CV–274–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

March 9, 1995.

---

Shelly Blum, Charlotte, NC, Ronald L. Chapman, Murphy & Chapman, Charlotte, NC, for plaintiff.

Philip M. Van Hoy, Van Hoy, Reutlinger, & Taylor, Charlotte, NC, for defendant.

### MEMORANDUM OF DECISION and ORDER

ROBERT D. POTTER, Senior District Judge.

THIS MATTER is before the Court on cross motions for summary judgment.

#### Procedural History

On August 20, 1993, the Plaintiff filed a complaint asserting the Defendant is liable for 1). sexual harassment in violation of Title VII, 2). retaliation in violation of Title VII, and 3). intentional infliction of emotional distress.

On January 13, 1995, the Defendant filed a motion for summary judgment, along with a supporting memorandum and depositions.

On February 7, 1995, the Plaintiff moved for an extension of time to respond. Although the Plaintiff's motion was not in compliance with the standard Pretrial Order filed in this case, the motion was granted and the Plaintiff was given until February 17, 1995, to respond. Counsel for the Plaintiff was

admonished that all further filings must be in compliance with the Pretrial Order.

On February 21, 1995, the Plaintiff filed a memorandum in support of motion for summary judgment and in opposition to the Defendant's motion. This memorandum was unaccompanied by a motion. Further, although the memorandum contains multiple references to various depositions, the Plaintiff did not file a single deposition.

On February 23, 1995—a full five days after the February 17, 1995 deadline imposed by the Court—the Plaintiff filed a motion for summary judgment but no depositions.

The Defendant, after being granted an extension, filed a reply on March 7, 1995.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides,

> ... judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (West 1993).

Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id., Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). To attain summary judgment, the movant bears an initial burden of demonstrating no genuine issues of material fact are present. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must point out specific facts which create disputed factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party may not rest on "mere allegations or denials," but must set forth specific facts "by affidavits or as otherwise provided in [Rule 56]." *Federal Rule of Civil Procedure* 56(e). In evaluating a summary judgment motion,

district courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds could recognize as real factual disputes." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party. *Matsushita Electric Industrial Co.,* 475 U.S. at 587, 106 S.Ct. at 1356. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### Facts

The Plaintiff in this case was a female employee of the Defendant bank from March 13, 1991, to June 17, 1993. The Plaintiff alleges that while she was employed at the Defendant bank, she was sexually harassed by a male co-worker in her department, which created a "hostile work environment." The Plaintiff further alleges that when she reported some of the alleged harassing incidents to her supervisors, her co-workers retaliated. The Plaintiff contends that the Defendant bank should be liable for the alleged harassment and retaliation. The Plaintiff also contends that the harassment and retaliation amounted to intentional infliction of emotional distress.

Most of the facts material to this case are genuinely disputed. The Plaintiff and the Defendant have substantially differing accounts as to what occurred in the workplace. Nevertheless, if the Court accepts the Plain-

tiff's version of the facts as true, the Defendant is entitled to summary judgment as a matter of law. The Court will proceed with its analysis gleaning the Plaintiff's version of the facts from the portions of her deposition which were submitted by the Defendant.[1] As for any material fact not addressed in the Plaintiff's deposition, the Court will look to the unopposed depositions filed by the Defendant.

### A). The Hand–On–Hip and Rubber Band Incidents.

The Plaintiff alleges that in October or November of 1991, a co-worker in her department—Eric Wright—put his hand on the Plaintiff's hip, licked his lips, and said: "umm.. I'd like to have some of that." (Wilson Depo. at 13–14.) The Plaintiff turned around and said to Wright: "don't do that.... keep your hands off of me." (Wilson Depo. at 17.) Wright then threw his hands up in a surrendering motion and said: "oh, oh, oh." (Wilson Depo. at 17–18.) This alleged incident occurred in the work place. (Wilson Depo. at 14.) Later that day, the Plaintiff told Wright that she did not "want anyone, guys or, you know, anyone putting their hands on [her] hips," that she "just [does not] play like that," and asked him "please don't ever do that again." (Wilson Depo. at 18.) Wright responded: "okay, okay, okay." (Wilson Depo. at 18.) The Plaintiff did not report this incident to a supervisor at the time. (Wilson Depo. at 19.) Wright never did this to her again. (Wilson Depo. at 36.)

Later in the week, Wright shot the Plaintiff in the hip with as many as three rubber bands. (Wilson Depo. at 19.) The Plaintiff returned fire. (Wilson Depo. at 19.) Other workers, all female, also shot rubber bands. (Wilson Depo. at 21–22.)

About a week after the hand-on-hip incident, the Plaintiff complained about the hand-on-hip and rubber band incidents to her department supervisor, Richard Burch. (Wilson Depo. at 25.) Burch, within four days of the Plaintiff's complaint, wrote a memo and held a meeting (with Wright present) where he told the department that the

bank is a workplace and he wanted everyone to stop "cutting up" at work. (Wilson Depo. at 25; Complaint at 2.) The Plaintiff alleges no subsequent rubber band shooting or hand-on-hip incidents.

### B). The Hiked Pants, Dirty Cartoons, and "Older Women" Incidents

The Plaintiff alleges that, after the meeting with Burch, Wright would "yank up his pants as high as he could get them so that [the outline of] his genitals would show and then he would get in front of your face." (Wilson Depo. at 26.) However, the Plaintiff makes inconsistent claims about how many times this occurred. In her complaint she alleges this occurred on "several occasions." (Complaint at 2.) In her deposition she alleges it occurred "25 to 30 times." (Wilson Depo. at 35.) The Plaintiff would "turn away and ... say 'Eric, please don't do that.'" (Wilson Depo. at 35.) The Plaintiff never reported this to any member of management. (Wilson Depo. at 28.)

The Plaintiff also alleges that, after the meeting with Burch, some of her co-workers would show her "dirty cartoons." Wright brought in one of these cartoons, but a majority of them were brought in by Van Ervin—a female co-worker. (Wilson Depo. at 28, 33.) The department, both male and female, was generally "laughing and joking" about the cartoons. (Wilson Depo. at 32.) When Wright showed the Plaintiff a cartoon, the Plaintiff turned away. (Wilson Depo. at 26.) When Tish Jones—a female co-worker—showed the Plaintiff a cartoon, the Plaintiff said she did not want to see it. (Wilson Depo. at 28.) Burch was shown a cartoon and appeared to think it was funny. (Wilson Depo. at 32.) The Plaintiff never complained to management about the cartoons. (Wilson Depo. at 32.)

The Plaintiff alleges that Wright, who is half the Plaintiff's age, told the Plaintiff on two occasions he "preferred older women." (Wilson Depo. at 40.) Both times this occurred, Wright was telling the Plaintiff about how his girlfriend was young and very interested in getting married and having a baby.

---

1. The Court again notes that the Plaintiff submit- ted no supporting depositions.

(Wilson Depo. at 39–40.) The Plaintiff never complained about this to management. (Wilson Depo. at 40.)

### C). *The Clipboard Incident*

The Plaintiff alleges that on June 22, 1992, Wright "finished a session of holding up his pants, ..." while singing a song that is played on the radio "about hips and butts and things like that." (Wilson Depo. at 47–48, 54.) Then, as the Plaintiff was leaning over an office machine that had jammed, Wright "wacked" her in the hip with a clipboard. (Wilson Depo. at 48.) The "wack" "felt like bee stings" and the Plaintiff was "stunned," "fell into the machine," "saw stars" and "had tears running from [her] eyes." (Wilson Depo. at 48.) Other coworkers, mostly women were present. (Wilson Depo. at 49.) The Plaintiff "could hear people laughing." (Wilson Depo. at 48.)

The Plaintiff did not seek medical attention until about a week later, but even then, did not actually see a doctor because she did not have a worker's compensation report and did not want to pay the doctor herself. (Wilson Depo. at 51, 56.) The Plaintiff ultimately saw a doctor six or seven weeks after the clipboard incident. (Wilson Depo. at 55.)

When the clipboard incident originally occurred, the Plaintiff did not report it to management because "[Burch] was out of town." (Wilson Depo. at 60.) The Plaintiff subsequently reported the incident to Burch. (Wilson Depo. at 61.) The Plaintiff tried three times to relate the incident to Burch's supervisor—Sheila Ezell—but was unable to contact her. (Wilson Depo. at 61.) On the recommendation of Burch, the Plaintiff told Renita Barton, who works as an Affirmative Action Coordinator in the Defendant's Personnel Department, that "[she] had been hit [and she] had a bruise on [her] hip." (Wilson Depo. at 61.) Barton asked if she wanted to file a worker's compensation claim, but the Plaintiff declined at that time. (Wilson Depo. at 61.) Burch took Eric Wright into his office and told him that "in no circum-

stances should [he] ever touch another employee, and that there certainly shouldn't be any hitting of another employee" and "actions of that sort at some point could lead to him losing his job."[2] (Burch Depo. at 62–63.) Burch does not remember the exact date of this reprimand, but does remember it being when Personnel first became aware of the clipboard incident. (Burch Depo. at 63.)

After the clipboard incident, the Plaintiff felt that Tish Jones (a female co-worker) and Eric Wright were teasing her because she complained to management. In response to the Plaintiff's concerns, Burch transferred the Plaintiff to another department where she worked in a separate room with only one other person. (Wilson Depo. at 65.) The Plaintiff also received a raise as a result of this transfer. (Wilson Depo. at 68.) The Plaintiff was "overjoyed" and "really appreciated" the transfer. (Wilson Depo. at 65, 68.)

After the Defendant's transfer, Jones "would come to the door, shut the door behind her and ask [the Plaintiff] what [she] was doing" and why she would not talk to Wright or Jones. Jones would also "get closer and closer to" the Plaintiff until the Plaintiff "would get up, open the door and leave." (Wilson Depo. at 66.) Wright would "do the same thing" and would sometimes "come and lean over top [sic] of [the Plaintiff]." (Wilson Depo. at 66.) Burch told Jones and Wright not to go into the room where the Plaintiff was working and to leave her alone. (Wilson Depo. at 66.) Subsequently, Wright only entered the room one more time for a business purpose—not to harass. (Wilson Depo. at 66.) Jones continued to enter the room, but Burch "physically opened the door and pulled [Jones] out and told her in her face don't come in here any more bothering ..." (Wilson Depo. at 66.)

At some point Burch told the Plaintiff that she was too slow and needed to pick up the pace of her work. (Wilson Depo. at 66.) The Plaintiff admits that she was not keeping up with her work. (Wilson Depo. at 76.) The Plaintiff missed 26–28 scheduled work

---

**2.** This testimony comes from Burch's deposition, which was submitted by the Defendant. The Plaintiff does not in her deposition affirm or deny that Burch reprimanded Wright in this manner. In fact, the Plaintiff has not submitted any evidence that disputes Burch's account of the reprimand. Accordingly, that Burch so reprimanded Wright is an undisputed material fact.

days in the one and a half to two years she worked for the Defendant. (Wilson Depo. at 127.) The Plaintiff resigned from her position by giving two weeks notice. The Plaintiff does not say why she resigned. The first week of her notice she spent on vacation. (Wilson Depo. at 89.) When she returned for her second and final week, the Plaintiff took a sick day, but ran into another employee of the Defendant when she was out shopping. (Wilson Depo. at 127.) The Plaintiff was fired, but was paid for the second week. (Wilson Depo. at 89.)

### Analysis

#### 1). Sexual Harassment

■ The Supreme Court first recognized Title VII's prohibition against "hostile environment" sexual harassment in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment' " *Id.* (Quoting *Henson v. Dundee,* 682 F.2d 897 (1982) (alteration in original)). "To prove a hostile work environment claim under Title VII, the plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on sex, (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer." *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989) (citing *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (1987)). In evaluating the case at bar, the Court must determine if the facts alleged by the Plaintiff satisfy each of these four elements.

■ First, with the possible exception of the rubber band incident, it is undeniable that the conduct complained of was "unwelcome." When Wright put his hand on the Plaintiff's hip, she responded "don't do that. . . . keep your hands off of me." (Wilson Depo. at 17.) When the Plaintiff was shown a cartoon or when Wright hiked his pants, the Plaintiff would "turn away." The clipboard incident caused the Plaintiff physical pain. Accordingly, the Court finds that the Plaintiff has met the first element.

■ Second, the alleged conduct could reasonably be found to have been based on sex. The hand on hip, hiked pants, and cartoon incidents, if they occurred as alleged by the Plaintiff, clearly have sexual overtones. Moreover, the older women, rubber band, and clipboard incidents, especially when looked at as being committed by a male and as occurring along with the hand on hip, hiked pants, and cartoon incidents, could reasonably be seen as based on sex. In short, a reasonable fact finder could find that the alleged behavior is based on sex. Accordingly, the Plaintiff has met the second element for summary judgment purposes.

■ Third, the alleged conduct could reasonably be found to be severe or pervasive. "Whether . . . [the alleged conduct] is sufficiently severe or pervasive is quintessentially a question of fact. Summary judgment [is] inappropriate unless, accepting [the Plaintiff's] evidence as true and drawing all justifiable inferences in her favor, a fact finder could not reasonably conclude [the conduct] was so severe or pervasive as to create an abusive work environment." *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir. 1989). Moreover, the severity and pervasiveness are in an inverse ratio. *Ellison v. Brady,* 924 F.2d 872 (9th Cir.1991). That is, the more severe the conduct, the less pervasive it need be to be actionable. Conversely, the more pervasive the conduct, the less severe it need be to be actionable. In the case at bar, the alleged conduct is more than an isolated incident (therefore possibly pervasive) and involved physical contact (therefore possibly severe). Hence, a reasonable fact finder could find that the alleged conduct is sufficiently "severe or pervasive" to be actionable. The Plaintiff has satisfied the third element for summary judgment purposes.

■ Fourth, no basis exists for holding the Defendant bank liable for any harassment committed by its employees. The alleged harassment was not committed by a supervisor, but by a fellow employee—Eric Wright. "In a hostile environment claim such as we have here, an employer is liable for one employee's sexual harassment of another worker if the employer had 'actual or

constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action.'" *Id.* at 106 (quoting *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983)).

By the Plaintiff's own testimony, the Defendant never had actual knowledge of the hiked pants, the cartoons,[3] or the "older women" incidents because she did not complain about them to her supervisors. Accordingly, the Defendant had no actual knowledge of any hostile work environment which may have arisen out of the incidents the Plaintiff failed to complain about. Further, these incidents were not so pervasive or obvious as to give the Defendant constructive knowledge.

▇▇ The only incidents the Plaintiff complained to management about that could create a hostile environment were the hand-on-hip, rubber band, and clipboard incidents. Accordingly, the Defendant had actual knowledge of any hostile work environment which may have arisen out of the hand on hip, rubber band, and clipboard incidents.

However, when the Defendant learned of these incidents, it did not "'acquiesce in a practice of' sexual harassment." *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983) (quoting *Garber v. Saxon Business Products, Inc.,* 552 F.2d 1032 (4th Cir.1977). Instead, the Defendant took prompt remedial action that was "reasonably calculated to end the harassment." *Id.* at 256. By the Plaintiff's own account, her complaint to Burch about the hand on hip (which the Plaintiff waited a week to complain about) and rubber band incidents precipitated within four days a meeting with the department and a memo. Although holding a meeting and issuing a memo are not the most forceful remedial actions, it is unquestionably an appropriate first response to behavior that was initially relatively mild and isolated. In fact, there were no more hand-on-hip or rubber band incidents. No reasonable fact finder could find that the Defendant did not take prompt remedial action which was reasonably calculated to end the rubber band and hand-on-hip type of behavior that the Plaintiff complained of.

As for the clipboard incident, the Plaintiff did not report it right away, but instead waited for Burch to come back from out of town. Then, after about a week, the incident was referred to the Personnel department. At the direction of Personnel, Burch took Eric Wright into his office[4] and told him that "in no circumstances should [he] ever touch another employee, and that there certainly shouldn't be any hitting of another employee" and "actions of that sort at some point could lead to him losing his job."[5] (Burch Depo. at 62–63.) Burch does not remember the exact date of this reprimand, but does remember that it was when Personnel first became aware of the clipboard incident (i.e. about a week after the incident). Further, the Plaintiff was ultimately separated from her alleged harasser when she was transferred to another department. This transfer was welcomed by the Plaintiff and even included a raise. When Wright continued to bother the Plaintiff in a non-sexual manner in her new work area, he was told to stay out of her new work area and leave her alone. Wright did not bother the Plaintiff again. In sum, all the evidence submitted in this case shows that the Defendant did not just sit on its hands when the Plaintiff complained. Instead, the Defendant attempted to remedy the situation by reprimanding Eric Wright individually, and ultimately by separating him from the Plaintiff. The Defendant clearly took prompt remedial action reasonably calculated to end the alleged harassment.

---

**3.** The Court notes that Burch did see these cartoons, that he remembers them depicting "two people joking comments back and forth to each other," and that he does not "really remember anything obscene." (Burch Depo. at 8.) However, even assuming the cartoons were in fact offensive, there is no evidence that Burch knew these cartoons were actually or more than likely shown to the Plaintiff or that he knew the Plaintiff was offended.

**4.** Burch likewise reprimanded Jones, who apparently was also involved in the clipboard incident.

**5.** This testimony comes from Burch's deposition, which was submitted by the Defendant. The Plaintiff does not in her deposition affirm or deny that Burch reprimanded Wright in this manner. In fact, the Plaintiff has not submitted any evidence that disputes Burch's account of the reprimand. Accordingly, that Burch so reprimanded Wright is an undisputed material fact.

Therefore, the Plaintiff is unable to establish that the Defendant is liable for any hostile work environment which may have been created by the actions of a co-worker, and her sexual harassment claim fails. Summary judgment will be granted for the Defendant on this issue.

### Retaliation

Title VII prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an unlawful employment practice. 42 U.S.C. § 2000e–3. In her complaint, the Plaintiff alleges that the Defendant retaliated against her in violation of title VII because:

> "[t]he conduct of the Defendant's employees in responding to the complaint of sexual harassment was demeaning, disrespectful, emotionally destructive to the Plaintiff and was deliberately done in retaliation for the very report of the conduct by the Plaintiff."

(Complaint at 4.) The Plaintiff amended her complaint to include an allegation that:

> [a]s part of its retaliation to the Plaintiff's charges of sexual harassment and employment discrimination, defendant [sic] was subjected to a working atmosphere which ratified and continued the harassment she reported. Defendant failed to protect her from further harassment. Plaintiff was compelled to resign to attempt to protect her own well being.

(Amended Complaint at 1–2.) The Court, however, finds this claim meritless.

 Preliminarily, the Court notes that the actual existence of an unlawful employment practice (sexual harassment) is not necessary for the Plaintiff to prevail on a Title VII retaliation claim, so long as the Plaintiff reasonably believed that the Defendant was engaged in an unlawful employment practice. *See, e.g., Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130 (5th Cir.1981) (cert. denied 455 U.S. 1000 (1982)). Therefore, the Court's grant of the Defendant's summary judgment motion on the claim of sexual harassment is not in itself fatal to the Plaintiff's claim of retaliation.

 For the Plaintiff to prevail on a claim of retaliation, she must show that 1). the employee engaged in protected activity; 2). the employer took adverse employment action against the employee; and 3). a causal connection existed between the protected activity and the adverse action. *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (1985). In the case at bar, the Plaintiff clearly engaged in protected activity by complaining to management about Wright's actions. However, the Defendant did not take adverse employment action against the Plaintiff. The Plaintiff contends that the Defendant's alleged failure to protect the Plaintiff from retaliatory teasing and badgering by Wright and Jones satisfies the adverse employment action element of the retaliation claim. However, as noted above, the Defendant did not fail to protect the Plaintiff, but instead took prompt remedial action reasonably calculated to end the alleged retaliatory harassment by Wright and Jones. Therefore, the Plaintiff cannot establish the second element of her retaliation claim and summary judgment must be entered in favor of the Defendant on this issue.

Finally, the Court notes that the Plaintiff only complains of retaliation by the Plaintiff's co-workers. The Plaintiff does not complain that management took any direct retaliatory action against her—such as her transfer or her discharge. Therefore, this issue is not properly before the Court. Nevertheless, the Defendant has submitted ample uncontradicted evidence showing that the Plaintiff's transfer was not retaliation, but was welcomed by the Plaintiff and accompanied by a pay raise, and that the Plaintiff's discharge was not in retaliation, but for good cause.

### Intentional Infliction of Emotional Distress

 To prevail on a claim of intentional infliction of emotional distress, the Plaintiff must show 1). that the Defendant engaged in extreme and outrageous conduct; 2). that the conduct was intended to cause severe emotional distress; and 3). that the conduct does in fact cause severe emotional distress. *Waddle v. Sparks,* 331 N.C. 73, 414 S.E.2d 22 (1992). "It is extremely rare to find conduct in the employment context that

will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon,* 861 F.2d 390 (3rd Cir.1988). In the case at bar, the Plaintiff has not alleged facts sufficient to support an intentional infliction of emotional distress claim. Moreover, the Defendant has submitted ample uncontested evidence showing that the Plaintiff cannot establish even one of the elements. This is a frivolous claim and summary judgment must be entered for the Defendant on this issue.

**NOW, THEREFORE, IT IS ORDERED** that the Defendant's motion for summary judgment be, and hereby is, **GRANTED.**

**IT IS FURTHER ORDERED** that the Plaintiff's motion for summary judgment be, and hereby is, **DENIED.**

This action will be dismissed in a separate Judgment filed simultaneously with this Order.