**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 95-40836.

Jean G. MATTERN, Plaintiff-Appellee,

v.

EASTMAN KODAK COMPANY and Eastman Chemical Company, d/b/a Texas Eastman Company, Defendants-Appellants.

Jan. 16, 1997.

Appeal from the United States District Court for the Eastern District of Texas.

Before GARWOOD, BARKSDALE and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The linchpin for this appeal is what constitutes an "ultimate employment decision" as required for a retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Eastman Kodak Company and Eastman Chemical Company (collectively "Eastman") contest the denial of a FED.R.CIV.P. 50 motion for judgment as a matter of law, a jury having found that Eastman had retaliated against Jean Mattern, its employee, but also having made two findings adverse to Mattern that limit her retaliation claim: first, that, although Mattern had been sexually harassed by her coworkers, Eastman did not fail to take prompt remedial action after it knew or should have known of the harassment; and second, that Mattern was not constructively discharged from her employment with Eastman. Mattern does not cross-appeal these adverse findings. We REVERSE and RENDER.

I.

Mattern, an Eastman employee from late 1989 to mid-1993, was enrolled in Eastman's lengthy mechanic's apprenticeship program, which has two components: on-the-job training and related instruction (classroom). The program requires successful completion of 14 "review cycles" which evaluate both components. Satisfactory performance during the review cycles results in regular pay increases. In addition, the program includes periodic "Major Skills Tests". An apprentice who receives either three unsatisfactory "review cycle" assessments or fails a skills test three times is subject to removal from the program.

Mattern filed a Title VII charge with the EEOC on March 11, 1993, claiming sexual harassment by members of her on-the-job training crew. She alleged that two senior mechanics, Godwin and Roberts, had sexually harassed her and created a hostile work environment. She further alleged that her supervisors knew of, and condoned, the harassment.

Earlier that month, Eastman had learned of, and began investigating, this charge. As a result, on March 11, it allowed Godwin to retire early; no action was taken against Roberts. Eastman then transferred Mattern to another crew in the department. Because of the transfer, Mattern was working under a different immediate supervisor, but her departmental supervisors remained the same. Mattern encountered difficulties which she equated, among other things, with Title VII proscribed retaliation. She resigned that July.

That November, Mattern filed this action against Eastman, alleging, *inter alia,* that it had a policy and practice of

approving and condoning a hostile work environment; had constructively discharged her; and had retaliated, and allowed its employees to retaliate, against her for reporting the harassment to the EEOC and for filing this action. The parties consented to trial before a magistrate judge.

A jury found that, although Mattern had been harassed by coworkers, Eastman had taken prompt remedial action; therefore, the hostile work environment sexual harassment claim failed. Likewise, it did not find constructive discharge or intentional infliction of emotional distress. (Mattern does not cross-appeal.) On the other hand, it found retaliation and awarded $50,000 in damages.

## II.

Eastman raises several issues. But first, we re-examine Mattern's jurisdictional challenge, premised on the timeliness *vel non* of Eastman's notice of appeal. *See, e.g., Mosley v. Cozby,* 813 F.2d 659, 660 (5th Cir.1987). This challenge has already been rejected by a motions panel.

### A.

The verdict was returned on March 24, 1995. A week later, the magistrate judge entered a "Judgment" against Eastman on the retaliation claim, and, a week after that, April 7, Eastman moved under Rule 50 for judgment or for new trial, contending that the retaliation evidence was legally insufficient. Five days later, the magistrate judge entered a second "Judgment", dismissing Mattern's harassment and emotional distress claims; a week later, Mattern moved for judgment or for new trial. Two weeks later, she

moved for attorney's fees as the prevailing party.

The court denied Eastman's Rule 50 motion on September 12. Three days later, it granted attorney's fees to Mattern, but denied her Rule 50 motion. That October 10, Eastman appealed the March 30 and April 12 "Judgments" and the September 12 and 15 orders. A "Final Judgment" was entered on October 27; an "Amended Final Judgment", on November 2.

Mattern's early April 1996 motion to dismiss this appeal for lack of appellate jurisdiction, asserting that Eastman's notice was untimely, was repeated almost *verbatim* in her brief filed later in April while the motion was pending and approximately two weeks after Eastman's response to the motion. The motion was denied in early May, a week in advance of Eastman's reply brief, which, understandably, did not respond again to Mattern's jurisdictional challenge.

Of course, a panel hearing the merits of an appeal may review a motions panel ruling, and overturn it where necessary. *United States v. Bear Marine Services,* 696 F.2d 1117, 1119 (5th Cir.1983). And, the merits panel must be especially vigilant where, as here, the issue is one of jurisdiction. *Id.* at 1120; *see also Commodities Futures Trading Comm'n v. Preferred Capital Inv. Co.,* 664 F.2d 1316, 1320-21 (5th Cir.1982). On a parallel track, Mattern's motion appears to be driven, in part, by the dispute over the timeliness of her attorney's fees motion, an aspect of which might require deciding which of the several "Judgments" was *the* "judgment" for purposes of FED.R.APP.P. 54(d)(2)(B) (unless otherwise provided by statute, motion for award of attorney's fees

must be filed within 14 days of entry of judgment).

As noted *infra,* we do not reach this fees-timeliness issue. Furthermore, we agree with the motions panel that the notice of appeal was timely. *See, e.g.,* FED.R.APP.P. 4(a)(2) (notice of appeal filed after announcement of decision or order but before entry of judgment treated as filed on date of and after entry of judgment) and FED.R.APP.P. 4(a)(4) (timely motion under Rule 50(b), among others, tolls time for appeal until entry of order disposing of last such motion outstanding); FED.R.CIV.P. 50(b).

### B.

At issue are the legal sufficiency of the retaliation evidence; evidence of pre-EEOC charge conduct by Mattern ruled inadmissible under FED.R.EVID. 412; and the attorney's fees award. Because the retaliation evidence was insufficient, we need not reach the other issues.

It goes without saying that the standard of review for Rule 50 motions for judgment is found in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc):

> [T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting [judgment as a matter of law] is proper.

*Boeing,* 411 F.2d at 374. To apply this standard, we look, of course, to the prerequisites for proving retaliation.

Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ...

under this subchapter." 42 U.S.C. § 2000e-3(a). A retaliation claim has three elements: (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action. *E.g., Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992). Eastman disputes the last two elements. We turn first to whether there was an "adverse employment action".

Basically, Mattern's retaliation proof is of five types. (In addition, Mattern testified that she was required to climb scaffolding in a fire protection suit that was too large, which she thought was unsafe; and that a telephone message was not given to her.) The special interrogatories did not require the jury to identify a basis, or bases, relied on in finding retaliation.

First, on the day Eastman brought disciplinary proceedings against Godwin, Mattern told her supervisor, Drennan, that she was ill, and that it was work-related. Because it was work-related, Drennan instructed her to report the illness to Eastman's medical department. Instead, Mattern went home, opting to take a day of vacation. Eastman then sent two of her supervisors, Drennan and Holstead (one of the supervisors named in Mattern's EEOC charge), to Mattern's house to instruct her to return to Eastman medical if her illness was work-related. Sending supervisors to an employee's home under such circumstances was highly unusual, if not unprecedented.

Second, Mattern was reprimanded for not being at her work station approximately three weeks later, March 29, when her

supervisors were looking for her. At the time, she was at Eastman's Human Resources Department discussing the hostility she was perceiving at Eastman.

Third, Mattern's co-workers became hostile to her after Godwin departed. Mattern testified that they would not say "hello", and would mutter "accidents happen"; that one supervisor (Holstead) told her he would fire her; and that her locker was broken into and some of her tools stolen. Mattern claimed that Eastman management knew of, but did nothing about, this hostility.

Fourth, Mattern became ill as a result of her anxiety over this situation. Her doctor felt this was attributable to the hostility at Eastman. He telephoned Eastman to report his concerns, but Eastman did not respond.

Fifth, Mattern's work was reviewed more negatively after her March EEOC charge, causing her to miss a pay increase, and therefore, in mid-May, to be on "final warning" of discharge from the apprenticeship program (she had missed another pay increase earlier in the apprenticeship). The poor evaluations were being completed and approved by supervisors who had praised her work in the past.

Many of the negative reviews, including the missed pay increase, resulted from Mattern's apparent inability to rebuild and realign centrifugal pumps. She also failed two Major Skills Tests, scoring only 19% and 47%. If she were to miss another pay increase, or fail another Major Skills Test, she would be recommended for termination. But, Mattern resigned her apprenticeship before her next evaluation and next test.

Before resigning, Mattern was assigned more work with pumps, including working one-on-one with a mechanic, Humble, in order to improve and evaluate her skills. They worked on one pump in particular, which they both testified was rebuilt correctly. Drennan, however, received a report from a mechanic, Roberts, whom Mattern accuses of bias, that the pump failed because of a reassembly defect. (As noted, Roberts was one of the co-workers Mattern named in the March EEOC charge.) Drennan documented the pump failure, and continued training Mattern.

Drennan instructed Mattern to attend a training session with another mechanic, Thomas. He told Mattern to realign a pump, which was resting on a wooden pallet, while he observed. After approximately three hours, she could not complete the task. A pump resting on a wooden pallet, as opposed to a more solid base, is more difficult to realign. In Mattern's view, it is reasonable to infer that the pump was deliberately placed on the pallet in order to scuttle her efforts to realign it and continue to the next segment of the apprenticeship program.

As noted, the jury found against Mattern on her sexual harassment and constructive discharge claims. As also noted, those adverse findings limit the bases for finding retaliation. Accordingly, the retaliation claim must be viewed in the context of these two jury findings adverse to Mattern. Along this line, after the court instructed the jury on the sexual harassment and constructive termination claims, it instructed on the retaliation claim. Concerning sexual harassment, the court instructed:

> Now in regard to Mrs. Mattern's Title VII claim of sexual harassment, Title VII ... prohibits employers from subjecting

their employees to sexual harassment. This includes unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature where the conduct has the purpose or effect of unreasonably interfering with the individual's work performance *or creating an intimidating, hostile or offensive working environment.*

In order for Eastman to be liable to Mrs. Mattern for the actions of Eastman's employees, she must prove four things: first, that she was subjected to unwelcome harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; secondly, that the harassment was based on her sex; and third, that the harassment affected a term, condition or privilege of her employment; and *finally, Eastman either knew or should have known that Mrs. Mattern was being sexually harassed and failed to take prompt reasonable measures to stop the harassment.*

For sexual harassment to be actionable, *it must be sufficiently severe or persuasive [sic] to alter the conditions of her employment or create an abusive working environment.* The conduct must be objectively severe or persuasive [sic] that such a reasonable person would find the conduct sexually hostile or abusive. Also, the employee must have subjectively considered the environment to be sexually abusive.

(Emphasis added.)

For constructive termination, the jury was instructed that Mattern "must prove that Eastman constructively discharged or terminated her in violation of Title VII *by proving that Eastman has made her working conditions so intolerable that a reasonable employee would feel compelled to resign*". (Emphasis added.)

And, for retaliation, the jury was instructed:

In regard to her retaliation claim, Title VII ... prohibits an employer from retaliating or discriminating against a person because that person has engaged in protective [sic] activity. Protective [sic] activity is an employee's conduct in opposing a discriminatory practice, making a charge of discrimination or testifying, assisting or participating in any manner in an investigation proceeding.

Now, in order for Mrs. Mattern to prevail on her claim of retaliation, she has to prove three things: first, that she was engaged in a protective [sic] activity; second, she suffered from an adverse employment action; and third, that Eastman acted out of a retaliatory motive in taking adverse

employment action.

> *Now, adverse employment action could be defined as a discharge, a demotion, refusal to hire, refusal to promote, reprimand, [or] acts of sabotage ... by employees against other employees, either condoned or directed by an employer for the purpose of establishing cause for discharge. Mere dirty looks or reluctance of co-workers to speak to an employee are not the types of adverse employment action prohibited by Title VII. Merely placing a memorandum regarding an employee's performance in his or her personnel file does not in itself constitute an adverse employment action.*

(Emphasis added.)

These instructions are not at issue on appeal. (The dissent totally ignores the "purpose of establishing cause for discharge" language in the retaliation instruction. Moreover, it grossly misstates our application of Title VII to the record in this case. In fact, the dissent seems to be dealing with another case entirely.)

Consistent with the retaliation instruction, our court has stated that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions". *Dollis v. Rubin,* 77 F.3d 777, 781-82 (5th Cir.1995). "Ultimate employment decisions" include acts "such as hiring, granting leave, discharging, promoting, and compensating". *Id.* at 782 (citing *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981)). (No authority need be cited for the necessary and longstanding rule that, absent a change in the law, a decision by our court is binding on subsequent panels. There has not been such a change; most unfortunately, the dissent is simply unwilling to adhere to

this rule. And, no matter the lengths to which it goes to distinguish *Dollis,* including expending considerable effort discussing *Page,* it cannot get around the binding precedent established by *Dollis.*)

Right off the bat, several of the events of which Mattern complains, although viewed in the requisite light most favorable to her, fall well below this standard. Hostility from fellow employees, having tools stolen, and resulting anxiety, without more, do not constitute ultimate employment decisions, and therefore are not the required adverse employment actions. *See Landgraf v. USI Film Prods.,* 968 F.2d 427, 431 (5th Cir.1992), *aff'd* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

In addition, these acts cannot be attributed to Eastman, especially when viewed in the light of the jury's remedial action and no constructive discharge findings. Moreover, there is no proof that these acts were by management. In general, Eastman cannot be held liable under Title VII absent proof that its employees acted as its agents. *See* Title VII's definition of "employer", 42 U.S.C. § 2000e(b) (act covers "employers" and their "agents", not "employees"). In short, a reasonable juror could not find, as required by the retaliation instruction, that these acts were condoned or directed by Eastman for the purpose of establishing cause for discharge—an ultimate employment decision.

Likewise, the other events, such as the visit to Mattern's home, the verbal threat of being fired, the reprimand for not being at her assigned station, a missed pay increase, and being placed on "final warning", do not constitute "adverse employment actions"

because of their lack of consequence. For starters, they do not meet the standard set out in *Dollis.*

There, the employee alleged that she: (1) was refused consideration for promotion; (2) was refused attendance at a training conference; (3) had her work criticized to a government vendor; and (4) was given false information regarding aspects of her employment, including access to travel funds and methods of filing EEO complaints. *Dollis,* 77 F.3d at 779-80. In holding that these acts did not constitute ultimate employment decisions, our court held also that they were at most "tangential" to future decisions that might be ultimate employment decisions. *Id.* at 782.

Mattern's problems at Eastman are similarly non-actionable. While she may have been in jeopardy of discharge from her apprenticeship program at some point in the future, this possibility obviously does not equal being discharged. Failing two Major Skills Tests, having difficulty with pumps, and having documented reprimands in her file may have increased the chance that she would *eventually* suffer an adverse employment action but, like the actions in *Dollis,* neither were they ultimate employment decisions nor did they rise above having mere tangential effect on a possible future ultimate employment decision.

To hold otherwise would be to expand the definition of "adverse employment action" to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future. Such expansion is unwarranted. *See Whitaker v. Carney,* 778 F.2d 216 (5th Cir.1985) *cert. denied,* 479 U.S. 813, 107 S.Ct. 64, 93

L.Ed.2d 23 (1986) (refusing to expand coverage of Title VII's anti-retaliation provision to include non-workplace hostility by non-employees).

Needless to say, *Dollis* is consistent with Title VII and prior case law. For example, *Hill v. Miss. St. Empl. Serv.,* 918 F.2d 1233 (5th Cir.1990), *cert. denied,* 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991), held that allegations that co-workers were staring at the employee, following her, prolonging the time she had to wait for disbursement checks, relegating her file to a less desirable classification, deleting experience data from a reference form, and criticizing her EEOC complaint did not constitute retaliation. *Hill,* 918 F.2d at 1241. Doubtless, some of these actions may have had a tangential effect on conditions of employment; but, as in Mattern's case, an ultimate employment decision had not occurred. The employee could only prove examples of the "many interlocutory or mediate decisions having no immediate effect upon employment conditions" which therefore were "not intended to fall within the direct proscriptions of ... Title VII". *Page,* 645 F.2d at 233. As another example, *see DeAngelis v. El Paso Mun. Police Officers' Ass'n,* 51 F.3d 591 (5th Cir.) (no adverse employment action when office newsletter ran articles routinely ridiculing the plaintiff based on her gender, and her having filed an EEOC complaint), *cert. denied,* --- U.S. ----, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995).

The import of these cases, culminating in *Dollis,* is the long-held rule that Title VII's anti-retaliation provision refers to ultimate employment decisions, and not to an "interlocutory or

mediate" decision which can lead to an ultimate decision. Obviously, this reading is grounded in the language of Title VII. As quoted earlier, the anti-retaliation provision states that employers shall not "discriminate" against employees for taking action protected by Title VII. 42 U.S.C. § 2000e-3. In defining this term, we look, of course, to other Title VII sections for guidance; in this case, the preceding section is helpful.

That section states, in part, that it is unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment". 42 U.S.C. § 2000e-2(a)(1). This type of employer action contrasts sharply with the more vague proscription, found in the next subpart, of "limitation" of employees which deprive or "would tend to deprive" the employee of "opportunities" or "adversely affect his status". 42 U.S.C. § 2000e-2(a)(1), (2). It goes without saying that this second subpart reaches much farther than the first. It reaches acts which merely "would tend" to affect the employee; obviously, the way in which the employee may be affected in this subpart is much broader. *Id.*

The anti-retaliation provision speaks only of "discrimination"; there is no mention of the vague harms contemplated in § 2000e-2(a)(2). Therefore, this provision can only be read to exclude such vague harms, and to include only ultimate employment decisions.

As discussed, another factor mandating the failure of Mattern's retaliation claim is that the jury found (1) she was not

constructively discharged and (2) Eastman did not fail to take remedial action. (She does not cross-appeal.) She preempted a possible ultimate employment decision—she resigned. *See Landgraf*, 968 F.2d at 431 (equating jury finding of no constructive discharge with no adverse employment action resulting in loss of position). Therefore, absent an ultimate employment decision prior to her resignation, there can be no adverse employment action.

The only event Mattern could possibly point to might be a missed pay increase. (Although there is evidence that Mattern missed two increases, one took place in November 1991, long before her March 1993 EEOC charge.) In any event, she did not prove that the increase would have taken effect by the time she resigned. In fact, she did not even assert in her brief in opposition to the Rule 50 motion, or in her brief here, that the missed pay increase was the ultimate employment decision. Instead, she contends that her problems at Eastman, including receiving poor evaluations and a missed increase, were "quickly *leading to the ultimate adverse employment action*". (Emphasis added.)

Moreover, at the time Mattern was receiving poor evaluations with respect to her work with pumps, she was also failing Major Skills Tests with respect to them. She does not maintain (nor did she prove) that the tests were "rigged"; accordingly, we must assume they were a correct assessment of her ability with the pumps. Obviously, an employee may not complain that not obtaining a position was retaliation if she was not qualified for that position in the first place. *Gonzalez v. Carlin,* 907 F.2d 573 (5th Cir.1990). Therefore, the evidence that Mattern was having trouble

in her Major Skills Tests precludes her contention that, but for the "sabotage", her progress through the pump section of the apprenticeship program would have been rapid. Mattern's missed pay increase evidence is not a basis for recovery on her retaliation claim.

In closing, we note that Mattern relies on *Armstrong v. City of Dallas,* 829 F.Supp. 875 (N.D.Tex.1992), for the proposition that reprimands constitute ultimate employment decisions. The employer was granted summary judgment in *Armstrong* on the basis that the causation element for a retaliation claim was lacking. The district court stated in *dicta,* however, that an adverse employment action could rest on proof that the employee: (1) received a letter of reprimand; (2) had efficiency ratings cut; (3) was reported to the Civil Service Department for unsatisfactory performance; (4) was informed he could be terminated for failure to lose weight; (5) received a letter of reprimand for losing his firefighter's coat; and (6) *was transferred to a non-firefighting job. Id.* at 880.

Because of the lack of causation, our court affirmed the summary judgment. *Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993). Therefore, this court never reached whether the above-listed incidents constituted adverse employment actions. In short, Mattern relies erroneously on *dicta* by the *Armstrong* district court.

Even if the missed pay increase were an adverse employment action, Mattern's evidence is insufficient to show that it resulted from retaliation. Otherwise, there was no adverse employment

action.  Because there was none, we need not reach whether Mattern proved the causation element.  Likewise, she is not a "prevailing party" under Title VII, and is, therefore, not entitled to attorney's fees.  42 U.S.C. § 2000e-5(k).

### III.

For the foregoing reasons, the denial of the motion for judgment is *REVERSED,* and judgment is *RENDERED* for Eastman.

*REVERSED and RENDERED.*

DENNIS, Circuit Judge, dissenting.

I respectfully dissent from the majority's reversal of the district court's judgment upholding the jury verdict awarding the plaintiff damages on her Title VII, § 704 retaliation claim and from the majority's appellate level entry of judgment as a matter of law against the plaintiff.  The majority seriously misreads Title VII and judicial precedents in its double-edged holding that (1) when the jury rejects an employee-plaintiff's § 703 claims of sex discrimination and constructive discharge, it is legally barred from looking at all of the relevant circumstances and awarding her § 704(a) retaliation damages based on retributive hostile environment discrimination;  and, (2) in such a case, in order to successfully prosecute a § 704(a) retaliation claim, an employee must prove that the employer discriminated against her in an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting, and compensating."

Correctly interpreted, § 704(a) affords an employee an independent hostile work environment retaliatory discrimination cause of action upon which she may recover in a proper case

regardless of the outcome of her § 703 sex discrimination and constructive discharge claims. In the present case the jury's retaliation award was not clearly erroneous and should have been affirmed. The evidence provided a sufficient basis for a reasonable juror to find that, after the plaintiff engaged in protected activity by filing a Title VII sexual harassment claim, adverse employment action against her occurred in the form of retaliatory discrimination (of which the employer knew or should have known) that was not remediated and sufficiently severe or pervasive as to alter the conditions of her employment and create a hostile or abusive working environment, and that there was a causal connection between her participation in the protected activity and the adverse employment action.

1. *Plaintiff's Hostile Environment Retaliation Claim is Independently Actionable*

Retributive harassment of an employee who has filed a § 703 sex discrimination and abuse claim constitutes retaliatory discrimination in violation of § 704(a) if, as in an actionable claim for sexual harassment under § 703, the employer knew or should have known of the harassment, failed to take remedial steps, and the abusive conduct was sufficiently severe so as to alter the conditions of employment and create a hostile work environment. The Supreme Court, in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), made clear that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. Nothing in § 704(a) of Title VII

suggests that hostile environment discrimination against an employee because she filed a charge alleging a sex discrimination violation should not be prohibited as unlawful retaliatory discrimination.

Jurists and legal scholars who have specifically addressed the issue have reached the conclusion that retaliatory harassment of an employee because she reported sexual harassment may constitute retaliatory discrimination in violation of § 704(a) if the requisite elements are proven. *See, e.g., Davis v. State of Calif. Dept. of Corrections,* 1996 WL 271001 (E.D.Cal. Feb. 23, 1996); *Cobb v. Anheuser Busch,* 793 F.Supp. 1457, 1491 (E.D.Mo.1990); *Toscano v. Nimmo,* 570 F.Supp. 1197, 1204-06 (D.Del.1983); *Tanner v. Calif. Physicians' Serv.,* 27 F.E.P. 593, 1978 WL 210 (N.D.Cal.1978); *EEOC v. Bank of Ariz.,* 12 F.E.P. 527, 1976 WL 1727 (D.Ariz.1976); *Hyland v. Kenner Prod. Co.,* 13 F.E.P. 1309, 1976 WL 561 (S.D.Ohio 1976); LINDEMAN & KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW at 282 (1992); 2 LARSON, EMPLOYMENT DISCRIMINATION § 34.04 at 34-57—34-62 (2d Ed.1994) ("Manipulation of such other employment conditions to constitute harassment or to tolerate harassment by fellow employees has likewise been perceived as retaliatory. Such harassment may take the form of interrogation, reprimands, surveillance, unwarranted or unfavorable job evaluations, or the deprivation of some of the normal benefits or rights of the position....") (footnotes citing cases omitted); 1 CONTE, SEXUAL HARASSMENT IN THE WORKPLACE § 3.28 at 163-64 (1994). This court apparently has assumed that such liability could exist in analyzing a retaliation claim. *See DeAngelis v. El Paso Municipal Police*

*Officers Assoc.,* 51 F.3d 591, 597 (5th Cir.1995); *Hamilton v. General Motors Corp.,* 606 F.2d 576, 581 (5th Cir.1979); *see also, Wilson v. Southern Nat. Bank of North Carolina,* 900 F.Supp. 803 (W.D.N.C.1995) (same as to prompt remedial action).

The EEOC's administrative interpretations indicate that the employer can be held responsible under § 704(a) for failing to remedy or prevent co-worker or customer retaliation against a § 703 claimant if the retaliation subjectively and objectively creates severe or pervasive hostility in the claimant-employee's working environment. EEOC COMPLIANCE MANUAL § 614.7, in pertinent parts, provides:

614.7 *Examples of Forbidden Retaliation*

(a) *Introduction*—Retaliation against people who protest unlawful employment discrimination can take many forms. Discussed in this subsection are some of the more widely recognized types of forbidden retaliation. This list is not intended to be exclusive.

* * * * * *

(c) *Harassment and Intimidation*—Harassing or intimidating an individual because that individual has opposed employment discrimination is a violation of § 704(a) and § 4(d). Harassment or intimidation can take many forms; some of the more common forms are set out below. (Also see § 615, Harassment; see also § 614.8(d) below):

* * * * * *

(4) Retaliatory reprimands. Unpublished Commission Decision No. 71-445 (1971).

(5) Coercive questioning. Commission Decisions No. 71-1151, CCH EEOC Decisions (1973) ¶ 6208. (See also *EEOC v. Plumbing and Pipefiters [sic] Industries, Local 189,* Title VII case.)

(6) Retaliatory surveillance. Commission Decision No. 70-683, CCH EEOC Decisions (1973) ¶ 6145.

* * * * * *

(g) *Other Examples of Retaliation*—The following types of retaliation represent violations of § 704(a) and § 4(d) but do not come under any particular heading.

\*   \*   \*   \*   \*   \*

(2) *Permitting others to retaliate against charging party or complainant*—If others, such as coworkers or respondent's customers, retaliate against charging party or complainant for having opposed employment discrimination, the respondent will, under certain circumstances, have a duty to take steps reasonably calculated to end the retaliation. For example, if a respondent knows or has reason to know of acts taken against a charging party by others because of his/her opposition to perceived discrimination, such respondent has an obligation to seek an end to the retaliation.

*Id.* (footnote omitted).

The EEOC has reached a similar position in administrative adjudications. *See EEOC Decision No. 79-59;* 1979 WL 6935 (EEOC 1979); *Commission Decision No.* YME9-068, CCH EEOC Decisions (1973) ¶ 6039.

According to the Supreme Court, the Fifth Circuit's *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), was apparently the first case to recognize a cause of action based upon a discriminatory work environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986). The Supreme Court quoted with approval from this court's explanation that an employee's protections under Title VII, § 703, extend beyond the economic aspects of employment:

"[T]he phrase "terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...." 454 F.2d, at 238.

*Vinson,* 477 U.S. at 66, 106 S.Ct. at 2405.

The Supreme Court in *Vinson* observed that courts generally applied the principle announced by *Rogers* to harassment based on race, religion and national origin, *id.* at 65; that in 1980 the EEOC drew upon that substantial body of judicial decisions in issuing Guidelines specifying that sexual harassment creating a hostile work environment is prohibited by Title VII; and that "[s]ince the Guidelines were issued, courts have uniformly held, and we agree, that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 65.

Thus, when this court, in *Whatley v. Metro. Atlanta Rapid Transit Auth.,* 632 F.2d 1325 (5th Cir.1980), first set forth the three-pronged test it follows in deciding Title VII, § 704(a), retaliation claims, the discriminatory work environment cause of action under § 703 was an established precedent of this court and many others. In *Whatley* this court held that to prove a prima facie case under section 704(a), the plaintiff must establish (1) that there was a statutorily protected participation, (2) that an adverse employment action occurred, and (3) that there was a causal link between the participation and the adverse employment action. In doing so, we observed that:

> Section 704(a) of Title VII is the primary source of protection against retaliation for those who participate in the process of vindicating civil rights through Title VII. Under that section broad protection is afforded to the participant in order to effectuate the purposes of Congress. *Pettway v. Am. Cast Iron Pipe Co.,* 411 F.2d 998, 1006, n. 18 (5th Cir.1969) ["The protection of assistance and participation in any manner would be illusory if employer could retaliate against employee for having assisted or participated in a Commission proceeding."]

*Whatley,* 632 F.2d at 1328 (footnote omitted). Consequently, it is inconceivable that this court, by its use of the shorthand judge-made term "adverse employment action," intended to exclude or legally could have excluded a cause of action based upon a discriminatory work environment from § 704(a)'s arsenal of protections for employee-complainants against all forms of retaliatory discrimination and adverse employment practices. In other words, co-worker harassment attributable to the employer that creates a hostile or abusive work environment for an employee because she opposed or complained of discrimination based on sex, race, color, national origin or religion, is a form of discrimination or adverse employment action prohibited by § 704(a).

Accordingly, an employee has an actionable retaliation claim under § 704(a) when (1) the employee participated in statutorily protected activity; (2) the employee suffered harassment by co-workers (i) that was sufficiently severe or pervasive as to alter the conditions of the victim's employment and create a hostile or abusive work environment, and (ii) the employer knew or should have known of the harassment and failed to take reasonably calculated steps to end the abuse; and (3) there was a causal link between the participation in the protected activity and the harassment creating the discriminatory work environment.

In assessing an employee's retaliation claim based on harassment creating a discriminatory work environment the teachings of *Vinson* and *Harris* should be kept in mind. The discrimination prohibited by Title VII is not limited to economic or tangible discrimination. *Vinson,* 477 U.S. at 64, 106 S.Ct. at 2404. The

discrimination must create an objectively and subjectively hostile or abusive work environment. *Harris,* 510 U.S. at 17, 114 S.Ct. at 368. But Title VII comes into play before the harassing conduct leads to a nervous breakdown. Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious. *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405-06. Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*

2. *Application of Discriminatory Work Environment Principles Requires That The Jury's Retaliation Award Be Affirmed*

We review jury verdicts for sufficiency of evidence pursuant to the standard articulated in *Boeing v. Shipman,* 411 F.2d 365, 374-75 (5th Cir.1969) (en banc). *Woodhouse v. Magnolia Hosp.,* 92 F.3d 248 (5th Cir.1996) (citing *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 993 (5th Cir.1996) (en banc)).

The plaintiff presented evidence that her employer was implicated in co-worker harassment of her because she had made prior complaints about sexual harassment by co-employees. The district court instructed the jury on the pertinent elements of Title VII and the nature of retaliatory discrimination under the statute. The jury specifically found in its verdict in response to

the court's interrogatories that the plaintiff was sexually harassed by her co-workers, that Eastman intentionally or wilfully retaliated against the plaintiff for filing a charge of discrimination and/or for filing this lawsuit, and that $50,000 would fairly and reasonably compensate the plaintiff for the damages proximately caused by Eastman's retaliatory actions. The evidence amply supports the jury's determinations and satisfies the three elements of a claim based on retaliatory discrimination under § 704(a).

First, it is undisputed that the plaintiff complained to the defendant's personnel department of coworker sexual harassment on or about March 3, 1993, and filed her initial Title VII charge on March 11, 1993.

Second, plaintiff presented sufficient evidence from which a reasonable trier of fact could find that after she complained of sex discrimination she was subjected to retaliatory harassment by co-workers that created a hostile or abusive work environment, about which the employer knew or should have known, and that the employer failed to take any steps reasonably calculated to end the retaliatory abuse. The majority accurately describes some of the principal parts of this evidence in its opinion. Mattern testified that she was required to wear a fire protection suit while climbing scaffolding that was unsafe because it was too large. Eastman sent two supervisors, one of whom was an alleged harasser, to her home, on a day she had taken vacation leave after complaining of an employment-related illness, to tell or require her to return to Eastman Medical if her illness was job-related. Sending

supervisors to an employee's home under such circumstances was highly unusual, if not unprecedented. Mattern was reprimanded for not being at her work station when she went to Eastman's Human Resources Department to complain that she was being harassed on the job. Mattern became ill over the perceived harassment; her doctor reported to Eastman that he was concerned and that her illness was related to the hostility. Mattern's work was reviewed negatively by supervisors after her first EEOC charge, causing her to miss a pay increase and to be given a final warning of potential discharge from the apprenticeship program. The supervisors who began to give her poor marks had praised her work before her EEOC complaint. The plaintiff presented testimony by herself and Eastman's own personnel that tended to show that a pump she had rebuilt had been sabotaged by co-workers, causing her to receive a negative evaluation and have her job placed in jeopardy. The district court emphasized this incident in its reasons for denying the defendants' motion for a judgment as a matter of law and, alternatively, for a new trial:

> [T]ampering with another employee's work by another employee could reasonably be construed as sabotage condoned or directed by an employer for the purpose of establishing cause for discharge, demotion, reprimand or refusal to promote. This sabotage could have reasonably taken place in response to Ms. Mattern's actions regarding her complaints of sexual harassment. Furthermore, at trial, Ms. Mattern produced evidence that the defendants acted out of a retaliatory motive condoning the actions taken by other employees against Ms. Mattern. Therefore, the Court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find for Ms. Mattern on her Title VII retaliation claim.

District Court's September 12, 1995, Order at 2-3.

Mattern points to additional evidence in the record that supports the jury verdict because it tends to prove co-worker

harassment with the knowledge of the employer or direct harassment by the employer and a resulting hostile work environment: after her initial Title VII complaint, she was assigned to a different crew but returned to the same work areas where her harassers were employed; she had a good work record and there was no complaint about her work before the Title VII charge; on March 30, 1993, her attorney sent a telefax to Eastman's counsel demanding that the retaliatory conduct cease; during March 1993 her doctor recorded that she suffered from depression and panic attacks; she testified that her work environment got worse after her complaint; that the other workers shunned her, gave her the silent treatment or muttered things like "accidents happen;" that one supervisor told her he would fire her; the doctor prescribed Zoloft and Prozac for her condition; the jury, in its last note sent during deliberation, asked: "May we award damages in answering Question # 8 [pertaining to damages for retaliatory actions] because we think Eastman's credibility and witnesses lied?"

Third, the plaintiff's testimony and other corroborating factors provided a sufficient basis for the jury reasonably to find a causal link between her initial sexual harassment complaints and the subsequent harassment creating a discriminatory work environment. Among the corroborating factors were the evidence of sabotage of Mattern's work product by co-workers that the trial court emphasized in its reasons for judgment; the episode in which she was required to assemble a pump on the unsteady surface of a wooden pallet which caused her poor performance; the abrupt descent of the supervisors' evaluations of her work after the

complaint was filed; her good work record up until that time; evidence that another apprentice had been allowed to fail tests and take more than the maximum allowable time to complete the program with no reprimand by management; the lack of any effective action by Eastman to stop the harassment of plaintiff despite several notifications to management level employees of the retaliatory acts by the plaintiff, her counsel, and her doctor.

Considering all of the circumstances, there was sufficient evidence for a reasonable trier of fact to find that the plaintiff was harassed by the employer directly through its supervisors, and indirectly by knowingly permitting co-worker harassment, because she had previously made informal and formal complaints of sexual harassment; that the retaliatory harassment occurred in the forms of retaliatory reprimands, retaliatory surveillance or confrontation and questioning at her home, and other acts of retaliation about which the employer knew or should have known but failed to take effective steps to remedy; that the harassment was sufficiently severe and pervasive to create a hostile or abusive work environment objectively and subjectively; and that there was a causal connection between her sexual discrimination complaints and the retaliatory harassment.

3. *The Majority Erroneously Conflates The Employee's § 703 Causes of Action Based on Sex Discrimination and Constructive Discharge With Her § 704(a) Retaliation Claim*

The majority errs seriously in holding that the jury's findings against an employee on her sexual harassment and constructive discharge claims "limits the bases for finding retaliation," by narrowing the ambit of the employee's § 704(a)

retaliation cause of action to one based on damage caused by the employer's "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating." It is perfectly plain that §§ 703 and 704(a) are separate and distinct provisions creating several independent causes of actions that serve different integral functions furthering the main purpose of Title VII. Section 703(a)(1) prohibits discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, or national origin. Section 704(a) prohibits discrimination against any employee because he opposed any practice made an unlawful employment practice by Title VII or because he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. The primary purposes of Title VII are to prevent discrimination, achieve equal employment opportunity in the future, and to make victims of discrimination whole. A claim of "hostile environment" sexual harassment is a form of sex discrimination that is actionable under Title VII, § 703(a)(1). *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) Section 704(a) of Title VII is intended to provide exceptionally broad protection for protestors of discriminatory employment practices. *Pettway v. Am. Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir.1969). The Supreme Court has held that Title VII provides, in actions under "section 703, 704 or 717," that "the complaining party may recover compensatory and punitive damages ..." *Langraf v. USI Film Products,* 511 U.S. 244, ----, 114 S.Ct. 1483, 1490, 128 L.Ed.2d 229 (1994) (emphasis

added), 42 U.S.C. § 1981a(a) (West Supp.1996).

The Fifth Circuit and other courts have recognized that the causes of actions afforded by §§ 703 and 704 are independent of each other, call for different elements of proof, and that the plaintiff's case under one cause of action does not depend upon her success under another. For example, it is not fatal to a plaintiff's § 704(a) case that she failed to prove an unlawful employment practice under § 703(a)(1); it is sufficient to establish a prima facie case of retaliation if she had a reasonable belief that defendant had engaged in the unlawful practice. *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130 (5th Cir.1981); *See EEOC Compliance Manual,* Section 614. Moreover, this court has recognized that there are significant differences between the employee's causes of actions for constructive discharge and for hostile work environment discrimination. To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. *Landgraf v. USI Film Products,* 968 F.2d 427 (5th Cir.1992), citing *Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071, 1077 (5th Cir.1981) (constructive discharge requires "aggravating factors"). Furthermore, the Fifth Circuit has held that a constructive discharge requires an actual intent to get rid of the employee: it occurs only "when the employer *deliberately* makes an employee's working conditions so intolerable that the employee is *forced* into an involuntary resignation." *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 310 (5th Cir.1987).

The majority's holding that an employee's failure to convince a trier of fact that she is entitled to relief under § 703 because of sex discrimination and constructive discharge limits the scope of her cause of action based on retaliation under § 704(a) is contrary to Congressional intent and departs from the settled precedents of this court. Moreover, it strikes a grievous blow to the entire enforcement mechanism of Title VII. As this court stated in *Pettway v. Am. Cast Iron Pipe Company,* 411 F.2d 998, 1005 (5th Cir.1969):

> There can be no doubt about the purpose of § 704(a). In unmistakable language it is to protect the employee who utilizes the tools provided by Congress to protect his rights. The Act will be frustrated if the employer may unilaterally determine the truth or falsity of charges and take independent action.

4. *The Majority Misunderstands The Prior Cases Applying §§ 704(a) & 717 And Erroneously Limits Employees to Retaliation Claims Based on "Ultimate Employment Decisions"*

The majority erroneously fails to consider whether the evidence as a whole was sufficient to justify a reasonable trier of fact in finding that the plaintiff suffered retaliatory discrimination prohibited by § 704(a) that created a hostile or abusive work environment. My colleagues were deflected from this course by their mistaken interpretation and application of dicta in cases decided under § 717: *Page v. Bolger,* 645 F.2d 227 (4th Cir.1981), and *Dollis v. Rubin,* 77 F.3d 777 (5th Cir.1995).

Title VII, § 717(a), in pertinent part, provides:

> **(a) Discrimination prohibited.** All personnel actions affecting employees or applicants for employment [in defined categories of Federal Government employment] shall be made free from any discrimination based on race, color, religion, sex, or national origin.

Congress added § 717 to Title VII in 1972 to extend the

protection of Title VII to employees of the Federal Government.  In *Chandler v. Roudebush,* 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416 (1976), the Supreme Court, in holding that § 717 affords federal employees the same right to a trial de novo as is enjoyed by private sector or state government employees under Title VII, stated:

> In 1972 Congress extended the protection of Title VII ... to employees of the Federal Government.  A principal goal of the amending legislation [adding § 717 to Title VII] was to eradicate " "entrenched discrimination in the Federal service,' " ... by strengthening internal safeguards and by according "[a]ggrieved (federal) employees or applicants ... the full rights available in the courts as are granted to individuals in the private sector under title VII."

*Id.* (citations and footnote omitted).

The majority mistakenly reads *Page v. Bolger* as holding that Congress, by adding § 717 to extend the protection of Title VII to employees of the Federal Government, somehow restricted the protection of employees in the private sector by Title VII, § 703.  According to the majority, *Page* reads a drastic limitation into § 703(a)'s broad prohibition against discrimination with respect to conditions of employment because of race, color, religion, sex, or national origin; *viz.,* to recover under § 704(a) the employee must prove that he was discriminated against by the employer in an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting, and compensating."  Nothing in the statute or in *Page* justifies such an interpretation.

In *Page v. Bolger,* a postal employee, who was twice denied promotions, brought suit against the Postmaster General claiming racial discrimination in violation of Title VII.  The district court found that Page had failed to establish his claim of

discrimination.  The Fourth Circuit affirmed, concluding that the inference of discriminatory intent raised by plaintiff's prima facie case was effectively dispelled by articulation of a legitimate nondiscriminatory reason; *viz.,* the better qualifications of the employees promoted, and that reason was not shown to be mere pretextual cover for a discriminatory motive.

In dictum, the *Page* court commented on a contention by the plaintiff that in effect introduced on appeal a new and dispositive theory neither advanced nor considered in the district court.  The Postal Service's Personnel Handbook provides that a review committee shall be designated to screen the applicants and to recommend the most outstanding to the appointing officer.  The official who designates a review committee is required to make every effort to select at least one woman and/or one minority group member.  The plaintiff argued for a modification of the *McDonnell Douglas* formula under which a claimant could establish a prima facie case by showing that he belonged to a minority;  he qualified for the position;  and he was denied promotion because of an evaluation by a review committee consisting only of white males. At this point under the modification the employer would be required to articulate some nondiscriminatory reason for the absence of a minority member on the review committee, and, if this were done, the pretext inquiry would focus on this reason, rather than the articulated reason for denying the promotion.

The majority of the Fourth Circuit, *en banc,* rejected plaintiff's proposed modification in dictum stating:

> The proper object of inquiry in a claim of disparate treatment under § 717 is whether there has been

"discrimination" in respect of "personnel actions affecting (covered) employees or applicants for employment...." 42 U.S.C. § 2000e-16(a) (emphasis added). Disparate treatment theory as it has emerged in application of this and comparable provisions of Title VII, most notably § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1), has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating. This is *the general level of decision* we think contemplated by the term "personnel actions" in § 717.

* * * * * *

By this *we suggest no general test for defining those "ultimate employment decisions"* which alone should be held directly covered by § 717 and comparable antidiscrimination provisions of Title VII. Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII *there are certainly others than those we have so far specifically identified* that may be so considered for example, entry into training programs. By the same token, ... *there are many interlocutory or mediate decisions having no immediate effect upon employment conditions* which were not intended to fall within the direct proscriptions of § 717 and comparable provisions of Title VII. We hold here merely that among the latter are mediate decisions *such as those concerning composition of the review committees* in the instant case that are simply steps in a process for making such obvious *end-decisions* as those to hire, to promote, etc.

*Id.,* 645 F.2d at 233 (emphasis added) (citation omitted).

A careful reading of the Fourth Circuit's opinion indicates clearly that the court did not interpret § 717 to rule out a cause of action by an employee who had been subjected to discriminatory harassment based on race, sex, religion, color or national origin that created a hostile or abusive work environment. Instead, the Fourth Circuit's dictum states that § 717 does not prohibit discrimination in "interlocutory or mediate decisions having no immediate effect upon employment conditions" such as the composition of a review committee. Clearly, by implication, the court viewed § 717 as proscribing discrimination in "end-decisions"

that have "immediate effect upon employment conditions," such as an employer's creation of a hostile environment discrimination based on sex, race, religion or national origin.  The court also expressly stated that the examples of unlawful employment actions immediately affecting employment conditions referred to, *viz.,* discrimination in hiring, granting leave, discharging, promoting, and compensating, did not constitute an exclusive list.  The court set forth these examples only to identify "the general level" of discriminatory unlawful employment practices forbidden by § 717, not to suggest a "general test" for defining the types of discrimination barred by §§ 703, 704 and 717.  At the time of the *Page* court's decision the cause of action based on a discriminatory work environment was well established under § 703 at the same "general level" identified in the court's opinion.  See *Vinson,* 477 U.S. at 65-66, 106 S.Ct. at 2404-05.  That the *Page* court drew no distinction between § 717 and § 703 but treated them as equivalents further indicates the court did not interpret § 717 as excluding such a claim.[1]

---

[1]In subsequent cases courts have disagreed with *Page's* restriction of "adverse employment action" to mediate decisions and have limited its holding to Federal Government employment cases.

   In *Hayes v. Shalala,* 902 F.Supp. 259, 266 (D.D.C.Cir.1995), the court noted that while its circuit had not directly addressed the holding in *Page,* "[w]here it has spoken, it has adopted a broader interpretation of actionable "personnel actions' than that of the Fourth Circuit."  (Citing *Palmer v. Shultz,* 815 F.2d 84 (D.C.Cir.1987)).  The court concluded that the plaintiff-employee "must be permitted to argue that the totality of actions taken by his employer collectively created a harassing and retaliatory environments, even if individual actions may not have left a permanent paper trail or may even have been "mediate' employment decisions as

In *Dollis v. Rubin,* 77 F.3d 777 (5th Cir.1995), the plaintiff, an EEOC specialist in the U.S. Customs Service, brought suit against the Secretary of the Department of the Treasury, claiming race, sex, and retaliation discrimination in violation of Title VII, § 717. The magistrate granted summary judgment to the Secretary, rejecting Dollis' primary claim that she had been discriminatorily denied a desk audit and her retaliation discrimination claims based on her employer's alleged acts or omissions in giving her false information about the return of a self-nomination for an award for the Federal Women's Program, informing her of the requirement that the EEO Manager approve each handwritten document prepared by her, and informing a vendor of an incorrect procurement procedure taken by her. This court affirmed on the ground that neither the denial of the desk audit nor the alleged retaliations arose to the level of an adverse personnel action or an ultimate employment decision, citing *Page v. Bolger. Id.* at 781.

*Dollis* is clearly distinguishable from the present case because Dollis did not claim that she had been subjected to retaliatory harassment that was sufficiently severe or pervasive to

---

identified by the Fourth Circuit in *Page.*

The court in *Howze v. Vir. Polytechnic,* 901 F.Supp. 1091, 1097 (W.D.Va.1995), noted that *Page* "was not a retaliation case, but rather addressed an attempt to rewrite the prima facie case requirements in a failure to promote case. Second, the court was defining the term "personnel actions' in 42 U.S.C.A. § 2000e-16(a), dealing with discrimination in federal employment.... There is no indication that the Fourth Circuit intended this definition to apply to the retaliation provision in section 2000e-3(a)."

create a discriminatory hostile or abusive work environment. Moreover, under the facts alleged and shown by Dollis, it is clear that no reasonable trier of fact could have found both objective and subjective perceptions that the environment was abusive. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation. *Harris,* 510 U.S. at 21-22, 114 S.Ct. at 370-71.

Nor do any of the other cases relied upon by the majority opinion hold or support the majority's implicit holding that acts of harassment and discrimination by co-workers attributable to the employer creating a hostile environment cannot collectively rise to a level of severity or pervasiveness to constitute discrimination prohibited by Title VII, § 704(a):

(1) In *Landgraf v. USI Film Prods.,* 968 F.2d 427, 431 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), this court affirmed the district court's findings that the plaintiff suffered severe enough sexual harassment from one male co-worker, a machinist, to create a hostile work environment, but that the conflicts and unpleasant relationships plaintiff had with other co-workers were not related to the charge she filed complaining of the machinist's sexual harassment; therefore, this court concluded, the plaintiff's conflicts with the other

co-workers could not constitute an underlying basis for her retaliation claim.

(2) *Whitaker v. Carney,* 778 F.2d 216 (5th Cir.1985), held that Title VII does not prevent an employer from disclosing to the complained-of individual sexual harassment in employment complaints made to the employer by its employees, and that, consequently, Title VII provides no basis for appellants' attempted removal to federal court under the federal civil rights removal statute on the asserted ground that to comply with appellee's state Open Records Act request would be an act inconsistent with a law providing for equal rights. Therefore, *Whitaker* is irrelevant here and did not refuse to expand coverage of Title VII's anti-retaliation provision as the majority opinion indicates.

(3) *Hill v. Miss. St. Empl. Serv.,* 918 F.2d 1233 (5th Cir.1990) *did not hold,* as the majority claims, that plaintiff's allegations that co-workers stared at her, followed her, delayed her disbursement checks, relegated the classification of her file, deleted experience data from her employment referral form, and criticized her EEOC complaint failed to constitute retaliation. Instead, this court held that the trial magistrate's finding that the plaintiff failed to prove these alleged facts was not clearly erroneous. *Id.,* 918 F.2d at 1241. Furthermore, this court's discussion of the retaliation claim in *Hill* does not mention or allude to ultimate, interlocutory or mediate employment decisions as the majority suggests. *Id.,* 918 F.2d at 1240-41;

(4) In *DeAngelis v. El Paso Municipal Police Officers Assn.,* 51 F.3d 591 (5th Cir.1995), this court set forth the criteria for

a Title VII hostile environment sex discrimination claim as: (a) Sexually discriminatory intimidation, ridicule and insults, which are (b) sufficiently severe or pervasive that they (c) alter the conditions of employment and (d) create an abusive working environment, citing *Harris* and *Vinson, id.,* 51 F.3d at 593, and held that the anonymous comments in ten columns of a police officer association's newsletter directed toward plaintiff and female officers in general were not so frequent, pervasive, or pointedly insulting as to create a hostile working environment; and that a reference in one of the columns to plaintiff's "E-I-E-I-O" [EEOC] complaint and an article reporting the association's intention to sue her for damages if her lawsuit proved groundless did not amount to an adverse employment action under any reasonable meaning of that term. *Id.,* 51 F.3d at 597.

(5) In *Gonzalez v. Carlin,* 907 F.2d 573 (5th Cir.1990), the plaintiff claimed that the Postal Service had discriminatorily failed to promote him because of his national origin, but he failed to present a prima facie case because the evidence showed that he had not yet acquired the two-year mechanical, electrical and electronic experience necessary to qualify for the Level 6 MPE maintenance mechanic position. For the same reason, his claim that his failure to receive the desired promotion was based on retaliatory motives was also rejected. The case has little, if any, relevance to an employee's claim that, as in the present case, is based on the employer's retaliatory conduct, directly and through employees for whom he is accountable, that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive

working environment.

## CONCLUSION

The majority opinion is in conflict with the aim of Congress in enacting Title VII. Section 703 of Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Section 704 of Title VII makes it unlawful for "an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." The Supreme Court has emphatically held that Title VII, § 703, is violated when the employer discriminates on the basis of sex by creating a hostile or abusive work environment, which "can be determined only by looking at all the circumstances." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. Consequently, it necessarily follows that Title VII, § 704, is violated when all the circumstances show that the employer has discriminated against an employee for participating in the enforcement of Title VII by creating a hostile or abusive work environment. There is no justification for recognizing hostile environment discrimination based on all circumstances under one section and not the other. Nor is there any justification for interpreting Title VII to afford less protection against retaliatory discrimination than against sexual, racial or other types of forbidden discrimination. This court has constantly recognized that, to effectuate the purposes of Congress, § 704(a)

affords broad protection against retaliation for those who participate in the process of vindicating civil rights through Title VII. *See, e.g. Whatley v. Metro. Atlanta Rapid Transit Auth.,* 632 F.2d 1325 (5th Cir.1980); *Pettway v. Am. Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir.1969).

Nevertheless, the majority has produced a holding that prevents a judge or jury from considering all the circumstances in retaliation cases and thereby severely impairs the cause of action based upon a discriminatory work environment under Title VII, § 704(a). The holding is based on the majority's mistaken interpretation of two judge-made terms that were never intended for the use my colleagues make of them. There is nothing to indicate that this court intended to narrow the scope of protection against retaliatory discrimination afforded by § 704(a) when it adopted the shorthand term, "adverse employment action," to assist its analysis of retaliation claims. Nor is it correct to conclude, as the majority must have, that the *Page* court had the authority and the intention, by its judge-minted term, "ultimate employment decision," to drastically narrow the meaning of discrimination under §§ 703 and 717, effectively abolishing altogether the cause of action based on a discriminatory work environment. Unfortunately, the majority has allowed its mistaken interpretation of the judge-made rules to lead it to an incorrect conclusion as to the meaning of Title VII.

Because I believe that the majority's decision is contrary to the clear statutory language, the Supreme Court decisions, and all prior jurisprudence, and that it will drastically weaken § 704(a)'s

protection against retaliation for those who participate in the enforcement of Title VII by immunizing employers who use hostile environment discrimination vengefully against them, I must respectfully dissent.