Kevin K. SMITH

v.

EQUITRAC CORPORATION.

No. Civ.A. G–98–521.

United States District Court,
S.D. Texas,
Galveston Division.

March 10, 2000.

David A. Jameson, Attorney at Law, Galveston, TX, mediator pro se.

Sheila Beth Owsley, Attorney at Law, Houston, TX, Douglas W. Poole, David P. Salyer, McLeod, Alexander, Powel and Apffel, Galveston, TX, for Kevin K. Smith, plaintiff.

Alfred John Harper, II, Fulbright & Jaworski, Houston, TX, Glenn M. Rissman, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, PA, Ft. Lauderdale, FL, Annette Torres, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, PA, Miami, FL, for Equitrac Corporation, defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff Kevin Smith, a black male, is employed as a Field Service Technician with Defendant Equitrac. Equitrac hired a white male from outside the company to fill the position of Senior Field Service Technician, and Smith alleges that Equitrac improperly failed to consider him for this promotion. According to Smith, Defendant's actions amount to racial discrimination in contravention of the provisions of the Civil Rights Act of 1871, 42 U.S.C. § 1981, and the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). Smith also alleges that after he filed a Charge of race discrimination with the United States Equal Opportunity Commission, Equitrac retaliated against him by placing him on probation, and thereby violated the anti-retaliation provisions of Title VII, 42 U.S.C. § 2000e–3(a). Now before the Court is Defendant's Motion For Summary Judgment, filed January 12, 2000.

For reasons set forth more fully below, Equitrac's Motion is **GRANTED** in its entirety.

## I. FACTUAL SUMMARY

Equitrac designs, manufactures, sells and maintains automatic systems for monitoring the usage of various office machines, including fax machines, word processors, telephones, and postal meters. Plaintiff Smith was hired on November 10, 1997 as a Field Service Technician for Equitrac's Houston office, a position which Smith still holds. In his capacity as Field Service Technician, Smith is responsible for network computer installations, service, troubleshooting and maintenance. Many of Equitrac's clients within the Houston service area are medium to large law firms.

At the time Smith was hired, there was one other Field Service Technician working in the Houston office, Todd Lisella, a black male. About a month after Smith was hired, Equitrac hired another black male, Ron Hudson, as a Field Service Technician. James Dabney, a white male, had been a Field Service Technician in the Houston office, but was promoted to Senior Field Service Technician about a month before Smith was hired. Dabney was responsible for coordinating the customer service performed by the Houston office.

Almost immediately after taking the job, Smith began to express his dissatisfaction with the way in which Dabney distributed the service calls to the Field Service Technicians. Smith believed that he and Hudson received an unfair proportion of the work assignments, and that Dabney and Lisella did little work and even falsified their database entries to make it appear that they were making service calls.

Smith initially complained about Dabney's work assignments to Ron Hollenback, Equitrac's Operations Manager in Dallas. When Debbie Johnson replaced Hollenback as Operations Manager, Smith also complained to Johnson about the allegedly inequitable work assignments. Johnson investigated Smith's complaints, and initially concluded, based on service statistics, that they were unsubstantiated. However, in an attempt to respond to Smith's complaints, Johnson eventually required the Field Service Technicians to log all service calls and prepare a daily service-to-do list. Both logs were to be faxed to Johnson on a daily basis.

Smith was not satisfied with these reforms, and continued to complain to Johnson about the work assignments. Smith then relayed his complaints to Robert Diano, Equitrac's Director of Human Resources, whose office is located at corporate headquarters in Florida.

After Diano had been drawn into the dispute, Johnson directed that Dabney was no longer to coordinate service calls in the Houston office. Instead, Tom Stubbs, working out of the Dallas office, was made responsible for work assignments. In addition, Johnson required the Field Service Technicians to turn in all service logs to Jeanette Riewe, the receptionist for the Houston office. Clients were required to sign the completed service reports to verify receipt of service. Johnson and Stubbs were also to call clients to confirm that service had been completed.

These corrective measures seemed to have had two effects. First, Dabney and Lisella resigned. Second, Smith admits that the work load was distributed more equitably. In spite of the success of these measures, Smith was not entirely happy with the new procedures, and continued to complain to Johnson.

The resignation of Dabney left the position of Senior Field Service Technician open. After placing an advertisement in the Houston newspapers, Equitrac interviewed and hired a white male from outside the company, Brian Bozovsky. Although at this point he had only five months experience on the job with Equitrac, Smith was upset that Bozovsky had been hired for this position. He complained to Johnson about the decision, and, not satisfied with Johnson's response, complained to Diano in Florida. Diano at-

tempted to resolve Smith's dissatisfaction by having Johnson explain to Smith that Bozovsky was not Smith's supervisor, and that Bozovsky would only be coordinating service within the Houston office.

It appears that even before Bozovsky was hired, Smith did not have a good working relationship with Johnson, his Dallas supervisor. According to Johnson, Smith often spoke to her in a disrespectful, authoritative and hostile tone of voice. Johnson alleges that when Smith called her in Dallas, he would tell Johnson's receptionist to "get her [Johnson's] hot ass on the phone" or "get her ass on the phone." Johnson alleges she learned that Smith made other derogatory remarks about her. Smith allegedly told others, in reference to Johnson, "God knows what the f__k she is doing," and referred to Johnson as a "hillbilly bitch."

After yet another unpleasant telephone conversation with Smith on June 22, 1998, Johnson decided that Smith's insubordination could no longer be tolerated, and elected to place Smith on probation for 30 days. Prior to this telephonic altercation, on June 15, 1998 Smith filed his EEOC Complaint, alleging that Equitrac's failure to promote him to the position of Senior Field Service Technician was motivated by racial discrimination. The parties hotly dispute whether Equitrac knew of the EEOC Complaint at the time it decided to place Smith on probation for insubordination. Smith contends that Equitrac learned of the EEOC Complaint before it elected to place him on probation, and that the probation was not really intended as a sanction for insubordination, but rather was retaliation for filing the EEOC Complaint.

Several months before Smith was placed on probation, Dianna Cruz, a Customer Service Representative working out of the Houston office, complained to Hollenback that Smith was sexually harassing her. Cruz alleged that Smith referred to her as "honey" and "baby", made inappropriate comments about her personal relationships, asked what she was doing on her personal time, and made comments to the effect that if Cruz wasn't married, he would marry her. Although both Hollenback and Johnson were aware of and investigated Cruz's allegations of sexual harassment, neither took immediate remedial action. Diano, the Director of Human Resources, was never informed of Cruz's allegations.

Diano apparently discovered the sexual harassment allegations when he was reviewing Smith's file after Smith was placed on probation for insubordination. Concerned that failure to take more formal remedial action on Smith's alleged sexual harassment might expose Equitrac to liability, Diano decided to extend Smith's probation for an additional 30 days.

In March of 1999, Johnson was fired, and Gerard Roth replaced her as Operations Manager in Dallas. Bozovsky resigned shortly thereafter. The position of Senior Field Service Technician has not been filled. No one in Houston is currently responsible for assigning service calls. Instead, clients now call a nationwide toll-free number and the service is distributed from this center.

Smith completed the 60 day probationary period with no adverse action taken against him. He still works for Equitrac as a Field Service Technician in the Houston office. His new supervisor, Roth, gave him a favorable performance review in April of 1999, and Smith received in consequence a 6% raise. In November of 1999, Roth gave Smith another generally favorable evaluation, and Smith is scheduled to receive a 5% salary increase. However, Smith has refused to sign the November 1999 evaluation because he does not believe he falls below company standards in such areas as "cooperation," "contributing in a professional, non-threatening manner," "tactfulness in sensitive situations," and "willingness to accept guidance."

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and

the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere *existence* of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casualty Co.*, 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

### III. THE RACIAL DISCRIMINATION CLAIMS

#### A. Methods of Proving Discriminatory Intent

Smith alleges that, because of his race, he was not considered or selected for the position of Senior Field Service Technician. Smith complains that Equitrac's actions violated the provisions of the Civil Rights Act of 1871, 42 U.S.C. § 1981, and the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").

Section 1981 claims are analyzed under the same standards as those employed for Title VII claims. *Casarez v. Burlington Northern/Santa Fe Co.*, 193 F.3d 334, 337 n. 3 (5th Cir.1999); *LaPierre v. Benson Nissan Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir.1996) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989)). For the sake of brevity the Court will refer to Plaintiff's Title VII and § 1981 claims as "Title VII" claims.

In general, there are two ways a plaintiff can show he was a victim of intentional discrimination. "A plaintiff can prove discriminatory animus by direct evidence, or by an indirect or inferential method of proof." *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir.1995). If the plaintiff elects the former approach, the plaintiff must offer "direct" evidence of discrimination, defined as "evidence that, if believed, proves the fact of intentional discrimination without inference or presumption." *Woodhouse v. Magnolia Hospital*, 92 F.3d 248, 252 (5th Cir.1996). The clearest example of "direct evidence" of discrimination would be "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994) (Posner, C.J.); *see also Mooney*, 54 F.3d at 1217–18 (analyzing characteristics of direct evidence).

Alternatively, a plaintiff may elect to prove the fact of intentional discrimination via the indirect or inferential approach. The indirect approach is governed by the familiar, tripartite burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). However, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines v. Thurston*, 469 U.S. 111,

121, 105 S.Ct. 613, 617, 83 L.Ed.2d 523 (1985); *see also Brady v. Fort Bend County*, 145 F.3d 691, 711 (5th Cir.1998) (citing *Thurston*); *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir.1990) (same); *Ahrens v. Perot Systems Corp.*, 39 F.Supp.2d 773, 780 (N.D.Tex.1999) (rejecting plaintiff's contention that she had stated a "direct evidence" case). Because Smith has produced no direct evidence of racial discrimination, his method of proof is the indirect or circumstantial variety, governed by *McDonnell Douglas–Burdine*.

### B. The Tripartite Burden Shifting Framework

At the first stage of the *McDonnell Douglas–Burdine* burden-shifting approach, Plaintiff must establish a prima facie case of race discrimination. *See McDonnell Douglas*, 411 U.S. at 801, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992 (5th Cir.1996) (en banc). If the plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747; *Rhodes*, 75 F.3d at 992–93.

If the defendant at this second stage of the *McDonnell Douglas–Burdine* analysis remains silent and fails to proffer a legitimate, nondiscriminatory reason for its action, there are two possible outcomes. If a reasonable fact-finder could not differ as to the existence of the facts constituting plaintiff's prima facie case, plaintiff will be entitled to judgment as a matter of law pursuant to either Fed.R.Civ.P. 50(a)(1) or 52(c). *See Hicks*, 509 U.S. at 509–510, 113

S.Ct. at 2748, 125 L.Ed.2d 407. But if reasonable minds could differ as to whether plaintiff has made out a prima facie case by a preponderance of the evidence, plaintiff is entitled to have the trier of fact decide that question. *See id.* Should the trier of fact find that plaintiff has indeed established his prima facie case by a preponderance of the evidence, it *must* render a verdict for the plaintiff, because, by definition, an un-rebutted presumption mandates the finding of the fact presumed. *See id.* at 510, n. 3, 113 S.Ct. at 2748.

Obviously, the *McDonnell Douglas–Burdine* framework is designed to put a price on defendant's silence at the second stage of the tripartite burden shifting framework. Thus a defendant may well chose not to remain silent at this stage, and instead attempt to meet its burden of production by proffering a legitimate, nondiscriminatory reason for its actions. If the defendant does so, the presumption of discrimination is rebutted, and it drops from the case.[1] *See Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–95; *Hicks*, 509 U.S. at 507, 511, 113 S.Ct. at 2749 (once rebutted, the presumption "simply drops out of the picture").

At the third stage of the burden shifting framework, plaintiff is given a "full and fair opportunity to demonstrate" that Defendant's proffered nondiscriminatory reason is not true but instead a pretext for intentional discrimination. *Burdine*, 450 U.S. at 255–66, 101 S.Ct. at 1095; *see also Hicks*, 509 U.S. at 508, 113 S.Ct. at 2747. Although the *McDonnell Douglas–Burdine* framework shifts the burden of *production* between the plaintiff and defendant, it is crucial to recognize that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450

---

**1.** Of course, while the rebutted *presumption* drops from the case, the alleged state of affairs underlying the prima facie case remains in the case if accepted as facts by the fact-finder. Thus the fact-finder is free to consider those facts, along with others, and draw

reasonable inferences from them in the course of making the ultimate determination of whether the plaintiff was the victim of unlawful intentional discrimination. *See Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095, n. 10.

U.S. at 253, 101 S.Ct. at 1093; *see also Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747, 125 L.Ed.2d 407.

## C. The Prima Facie Case

■ To establish a prima facie case of racial discrimination, a plaintiff must show: (1) he belongs to a protected group, (2) he was qualified for the position held or sought, (3) he suffered an adverse employment action, and (4) he was replaced by someone outside the protected class *or* he was treated less favorably than other similarly situated *or* otherwise show that he was subjected to adverse treatment due to his race.[2] *See Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir. 1998); *Hornsby v. Conoco, Inc.,* 777 F.2d 243, 246–47 (5th Cir.1985). The Court finds that a reasonable fact finder could conclude that Smith has shown the elements of his prima facie case. The first element is satisfied because the parties agree that Smith is a black male, and thus undeniably a member of a protected group. The third element is satisfied, because failure to promote an otherwise qualified individual can constitute an adverse employment action. The fourth element is satisfied because Bozovsky, a white male, was selected for the position sought by Smith.

The second element is the only debatable one of the four, and Equitrac briefly argues that Smith was not qualified for the position he sought. Because Smith had only five months experience at the time the job became available, it is debatable whether he was truly "senior" enough to be a Senior Field Service Technician. However, a plaintiff need only make a minimal showing to satisfy his evidentiary burden in establishing his prima facie case. *See Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751 ("Quite obviously, however, what is required to establish the *McDonnell Douglas* prima facie case is *infinitely less* that what a directed verdict [for plaintiff] demands.") (emphasis added); *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094 ("The burden of establishing a prima facie case of disparate treatment is not onerous"); *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999) ("Only a minimal showing is necessary to meet this burden"); *Nichols v. Loral Vought Systems Corp.,* 81 F.3d 38, 41 (5th Cir.1996). Smith arguably met the educational qualifications mentioned in the newspaper ad for this job. Moreover, the fact that Dabney had been promoted from

---

**2.** The disjunctive "or" in the fourth element of the prima facie case is a crucial component, yet all too easily elided. Indeed, some recent Fifth Circuit cases have stated the fourth element in such a way that a plaintiff cannot make out a prima facie case unless he can show that he was replaced by a person who is not a member of the protected class to which plaintiff belongs. *See Nieto v. L & H Packing Co.,* 108 F.3d 621, 624 n. 7 (5th Cir.1997) (recognizing conflict between earlier and later cases with respect to wording of the fourth element of plaintiff's prima facie case); *compare Singh v. Shoney's Inc.,* 64 F.3d 217, 219 (5th Cir.1995) (concluding that replacement by a member of the same protected class as plaintiff precludes establishment of a prima facie case) *with Hornsby v. Conoco, Inc.,* 777 F.2d 243, 246–47 (5th Cir. 1985) (recognizing that "the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the discharge was motivated [by] discriminatory reasons"). Absent an en banc Fifth Circuit or Supreme Court opinion to the contrary, the earlier, less restrictive interpretation of the fourth element of the prima facie case is the binding precedent within this Circuit. *See United States v. Texas Tech University,* 171 F.3d 279, 279 n. 9 (5th Cir.1999) ("Where two panel decisions conflict, the prior decision constitutes the binding precedent"); *United States v. Gray,* 751 F.2d 733 (5th Cir.1985) ("Under our court rules any such inconsistency must be resolved in favor of the earlier line, absent intervening decisions by the Supreme Court"); *Nieto,* 108 F.3d at 621 n. 7 (noting that insofar as the district court's decision was based on recent but conflicting decisions interpreting this element of the prima facie case, "such conclusion was not supported by the controlling authority in this circuit"). In any event, Smith plainly satisfies even the more restrictive interpretation of the fourth element, since it is undisputed that Equitrac selected Bozovsky, a white male, rather than Smith, a black male, for the position of Senior Field Service Technician.

734

Field Service Technician to Senior Field Service Technician tends to show that Smith was at least arguably qualified for the position. The Court finds that Smith has made the requisite "minimal showing" on the second element, and thus has established a prima facie case robust enough to withstand summary judgment.

## D. Equitrac's Nondiscriminatory Justification

■ Defendant's burden of producing evidence in support of the legitimate, nondiscriminatory reason underlying its action is "extremely light." See Thornton v. Neiman Marcus, 850 F.Supp. 538, 543 (N.D.Tex.1994). Defendant may satisfy that burden merely by producing any evidence, "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." See Hicks, 509 U.S. at 509, 113 S.Ct. at 2748 (emphasis in original). Moreover, the "defendant need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. The defendant can even discharge his burden of production at this stage by proffering an *illegal* justification. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 611, 113 S.Ct. 1701, 1707, 123 L.Ed.2d at 338 (1993) (holding that defendant had proffered a "legitimate" nondiscriminatory justification sufficient to satisfy his burden under the second stage of the McDonnell Douglas–Burdine framework, even though the proffered justification was found to violate another body of law, § 510 of the Age Discrimination in Employment Act of 1967).

Equitrac has submitted competent evidence which tends to show that Smith, along with all the other Field Service Technicians then working in the Houston office, was considered by management to be too new, and too technically unskilled, to merit promotion to the position of Senior Field Service Technician. Therefore Bozovsky, a significantly better qualified candidate, was hired instead. This is certainly evidence which, if believed by the trier of fact, would permit the inference that the adverse action was motivated by a nondiscriminatory reason. Consequently, the Court finds that Equitrac had carried its burden of production at the second stage of the McDonnell Douglas–Burdine framework. The presumption of discrimination created by Smith's prima facie case stands rebutted, and thus disappears from the case. See Burdine, 450 U.S. at 255, 101 S.Ct. at 1094–95; Hicks, 509 U.S. at 507, 511, 113 S.Ct. at 2747, 2749.

## E. The Pretext Stage

The third stage of the McDonnell Douglas–Burdine framework is commonly referred to as the "pretext stage," an unfortunate and potentially misleading label. At this stage the plaintiff, having lost the benefits of the presumption of discrimination, is given a "full and fair opportunity to demonstrate" that Defendant's proffered nondiscriminatory reason is not true but instead a pretext for intentional discrimination. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; see also Hicks, 509 U.S. at 508, 113 S.Ct. at 2748. The label "pretext stage," and other shorthand references to "pretexts," are potentially misleading insofar as they suggest that the plaintiff, by demonstrating the simple falsity of the defendant's proffered nondiscriminatory reason, has necessarily discharged his ultimate burden of persuasion: demonstrating that, more likely than not, he was a victim of unlawful intentional discrimination. In Hicks, the majority chided the dissent for conflating the term "pretext," understood to mean mere falsity of the employer's justification, with the more precise phrase, "pretext for discrimination." See Hicks, 509 U.S. at 513–14, 113 S.Ct. at 2750–51. As the Court explained, "a reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Id. at 513, 113 S.Ct. at 2752. (emphasis in original).

■ The Fifth Circuit has adopted the teachings of Hicks, and held, in an en banc decision, that for a plaintiff to withstand a

motion for summary judgment, a two part test must be satisfied. The plaintiff must produce competent evidence which (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer, and (2) creates a reasonable inference that discrimination was a "determinative factor" in the actions of which plaintiff complains. *See Rhodes,* 75 F.3d at 994 (en banc); *see also Casarez v. Burlington Northern/Santa Fe Co.,* 193 F.3d 334, 337 (5th Cir.1999) (citing two prong *Rhodes* test); *Scott v. University of Mississippi,* 148 F.3d 493, 504 (5th Cir. 1998) (quoting elements of two part test enunciated in *Rhodes*); *Walton v. Bisco Indus. Inc.,* 119 F.3d 368, 370 (5th Cir. 1997).

Moreover, the *Rhodes* decision established that the traditional sufficiency-of-the-evidence standards apply to evidence submitted by plaintiffs in order to avoid summary judgment in discrimination actions. *See Rhodes,* 75 F.3d at 993 (adopting the sufficiency-of-the-evidence standard articulated in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc)). To create a jury question, there must be "a conflict in substantial evidence." *Id.* (quoting *Boeing,* 411 F.2d at 375). Substantial evidence is defined as "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Boeing,* 411 F.2d at 374). A "mere scintilla" of evidence is not sufficient to create a jury question. *Id.* Moreover, it is possible for defendant to prevail on his motion for summary judgment even if plaintiff's evidence is more than a scintilla; this will be so if plaintiff's evidence is "so overwhelmed by contrary proof as to yield a directed verdict." *Id.* (quoting *Neely v. Delta Brick and Tile Co.,* 817 F.2d 1224, 1226 (5th Cir.1987)). Because direct evidence of discrimination is exceedingly rare, a plaintiff is permitted to satisfy his burden of persuasion by the introduction of circumstantial evidence. *See Burns v. Texas City Refining, Inc.,* 890 F.2d 747, 751 (5th Cir.1989). However, circumstan-

tial evidence, like direct evidence, must be "substantial." *See Rhodes,* 75 F.3d at 993.

Combining these principles, it is clear that for Smith's claims to survive Equitrac's Motion For Summary Judgment, Smith must produce "substantial evidence" which (1) creates a fact issue as to whether the decision to hire Bozovsky's was actually motivated by Equitrac's perception that Bozovsky was better qualified, *and* (2) creates a reasonable inference that racial discrimination was a determinative factor in the decision not to promote Smith to the position ultimately filled by Bozovsky. The Court now turns to the question whether Smith has met this burden.

## F. The "Clearly Better Qualified" Standard

Equitrac argues that "[t]o preclude summary judgment on his discriminatory failure to promote claim in the Fifth Circuit, Smith must produce evidence showing that he was 'clearly better qualified' than Bozovsky." In support of this proposition, Defendant cites to *Nichols v. Lewis Grocer,* 138 F.3d 563, 568 (5th Cir.1998) and *EEOC v. Louisiana Office of Community Serv.,* 47 F.3d 1438, 1444 (5th Cir.1995). In other words, according to Defendant, the *only* way for Smith to survive summary judgment on his failure to promote claim is to produce evidence that he is "clearly better qualified" than Bozovsky.

█ This is not the law. If a plaintiff can demonstrate that he is *clearly* better qualified, yet nevertheless was passed up for promotion, a reasonable fact-finder may conclude that discrimination motivated the decision. The more a plaintiff's qualifications are shown to be superior, the less rational the employer's decision not to promote him appears to be, until at some point illicit discrimination may be inferred to explain what otherwise is an inexplicable and irrational decision. While pointing to clearly superior qualifications is one permissible way to demonstrate intentional discrimination, a plaintiff is hardly *required* to make this showing. If showing

clearly better qualifications were a requirement, then it would be permissible under Title VII for an employer to refuse to promote members of protected groups on explicitly racial grounds, so long as the employer was careful to select for promotion candidates having qualifications roughly comparable to the rejected members of the protected class. But Title VII, by making it unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," clearly proscribes such conduct. Thus if plaintiff can otherwise demonstrate that the employer discriminated against him, the plaintiff will have a Title VII remedy, even if the promotion was given to another person with comparable qualifications. *See EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1095 n. 5 (5th Cir.1994) (noting that a showing by plaintiff that he was "clearly better qualified" is "merely one of many ways that a plaintiff can show" that the employer's actions were a pretext for discrimination; thus plaintiff "may prevail without a showing that he was clearly better qualified than those employees who were not terminated."); *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 814 (5th Cir.1991) ("[E]vidence that the plaintiff was clearly better qualified would be one way of showing" the defendant's proffered nondiscriminatory reasons were actually a pretext for discrimination.); *Bradley v. Delta*, No. Civ. A 1:97CV119–D–D, 1998 WL 378325 at *4, n. 3 (N.D.Miss. May 5, 1998) (rejecting defendant's argument that plaintiff is required to show that he was "clearly better qualified.").

It does not appear to the Court that Smith is attempting to demonstrate racial discrimination by proffering evidence to show that he was clearly better qualified than Bozovsky. Smith does not dispute that Bozovsky has superior educational qualifications, with many more years of experience as a computer technician. As the Court understands it, Smith is arguing that while he was concededly less qualified than Bozovsky, he was at least minimally qualified for the position, and was not considered for it because of illicit racial animus. The bulk of Smith's evidence is offered to show that Equitrac's proffered nondiscriminatory reason is false, and that various managerial employees of Equitrac are not credible. Other than this, Smith offers no evidence whatsoever that he may have been the victim of racial discrimination: there is no evidence of any racially derogatory comments, no evidence of any ugly or racially charged incidents in the office, no statistical information which might suggest some sort of suspicious racial disparity in employment, nor any other evidence which might even hint at the presence of racial animus. Thus the Court is confronted with the following subtle question in its starkest form: under what circumstances can a plaintiff avoid summary judgment when the *only* evidence produced, other than the facts underlying the prima facie case, is evidence tending to show the falsity of defendant's proffered nondiscriminatory justification?

## G. The Implicative Power of Falsifying Evidence

Evidence of intentional discrimination falls into three general categories: (a) the elements of the prima facie case, (b) evidence which tends to falsify the employer's proffered justification, and (c) evidence which independently suggests the existence of discriminatory animus. Under the third category belongs evidence of "suspicious timing, ambiguous statements oral or written, behavior towards or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 734. Also in the third category is "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a

difference in treatment received systematically better treatment." *Id.*

■ As was previously explained, it is quite clear under Fifth Circuit precedent that for a plaintiff's discrimination claims to survive defendant's motion for summary judgment, plaintiff must produce evidence which both (1) creates a fact issue as to whether each of the employer's nondiscriminatory reasons was what actually motivated the employer, and (2) creates a reasonable inference that discrimination was a determinative factor in the employer's decision. *See Rhodes,* 75 F.3d at 994; *Casarez,* 193 F.3d at 337; *Scott,* 148 F.3d at 504; *Walton,* 119 F.3d at 370. However, despite having promulgated this seemingly clear-cut two-part test, the Fifth Circuit has also indicated that under some circumstances evidence which tends to show the falsity of the employer's proffered nondiscriminatory reasons will itself support a reasonable inference of discriminatory motive. "A jury may be able to infer discriminatory intent in an appropriate case from substantial evidence that the employer's proffered reasons are false." *Rhodes,* 75 F.3d at 994. "The evidence may, for example, strongly indicate that the employer has introduced fabricated justifications for an employee's discharge, and not otherwise suggest a credible nondiscriminatory explanation." *Id.* In other words, sometimes evidence which satisfies prong (1) of the two-part *Rhodes* test will simultaneously satisfy prong (2). But this will not always be the case. "[A]lthough evidence of pretext, in conjunction with a prima facie case, usually creates a jury question on the ultimate issue of discrimination, it does not always do so." *Travis v. Board of Regents of Univ. of Texas,* 122 F.3d 259, 263.

Unfortunately, it is not at all clear precisely when evidence tending to falsify the employer's proffered nondiscriminatory reason will also suffice to support a reasonable inference of discrimination. The *Rhodes* decision suggests this will quite often be the case: "In tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will *often, perhaps usually,* permit a finding of discrimination *without additional evidence." Rhodes,* 75 F.3d at 994 (emphasis added). Relying on this statement, a later panel reasoned that "[b]y implication, *Rhodes* allows for the *extremely rare* situation where a finding of pretext will not permit a reasonable inference of discrimination." *Ontiveros v. Asarco Inc.,* 83 F.3d 732, 734 (5th Cir.1996) (emphasis added). Thus even under the two-part *Rhodes* test, it would appear that a plaintiff should often or usually be able to avoid summary judgment simply by presenting (a) evidence supporting a prima facie case, and (b) evidence tending to falsify the employer's proffered justification.

Nevertheless, in the following year the panel decision in *Walton* appeared to read the expansive *Rhodes* conception more narrowly. According to *Walton,* "[t]he plaintiff cannot succeed by proving only that the defendant's proffered reason is pretextual." *Walton,* 119 F.3d at 370. This narrow interpretation of *Rhodes* is also suggested by the statement that "[a]lthough we recognized in *Rhodes* that there *may* be a *certain subset* of cases in which the trier of fact may be able to infer discriminatory intent from 'substantial evidence' that the employer's proffered reasons are false, such does not alter the plaintiff's burden of persuasion". *Walton,* 119 F.3d at 372.

Other cases shed relatively little light on the circumstances in which evidence tending to falsify the employer's proffered justification simultaneously supports a reasonable inference of discrimination. The cases tend to address this issue on a case by case basis, with little analysis, and do not appear consistent with one another. *See Casarez,* 193 F.3d at 338 (reversing, with scant analysis, trial court's grant of defendant's motion for judgment as a matter of law because plaintiff "surmounted this hurdle with evidence that [defendant's] stated reasons for firing him were false coupled with his own good work rec-

ord."); *Travis,* 122 F.3d at 263 (overturning jury verdict for plaintiff and noting that "although evidence of pretext, in conjunction with a prima facie case, *usually* creates a jury question on the ultimate issue of discrimination, it does not always do so.") (emphasis added); *LaPierre,* 86 F.3d at 450 (noting that "we did not specify exactly what evidence was necessary to avoid summary judgment," and recognizing that while "[i]n some cases, 'substantial' evidence that the employer's proffered reason is false, without additional evidence, will support a reasonable inference of intent," in other cases, "evidence presented to rebut an employer's proffered reason will not, without additional evidence, support a reasonable inference of discriminatory intent."); *Louisiana Office of Community Servs.,* 47 F.3d at 1447–48 (upholding trial court's grant of summary judgment for defendant because plaintiff failed to offer any evidence that defendant's "stated reason was not the true one, such as that younger applicants were treated differently or that the explanation given was *so implausible as to be a coverup.*") (emphasis added); *see also Bradley,* 1998 WL 378325 at *5 (where "the only proof before the court regards the legitimacy of [defendant's] proffered reasons for the demotion," summary judgment for defendant was proper because this was not a case where such evidence of falsity was sufficient to support reasonable inference of discrimination.); *Walker v. Uncle Bens, Inc.,* No. Civ. A:4:97CV65–D–B, 1998 WL 173228 at *8 (N.D.Miss. Mar.30, 1998) (noting that "merely proving that the legitimate nondiscriminatory reason offered by the defendants is false is *generally insufficient* to circumvent the entry of summary judgment.") (emphasis added); *Goddard v. Sodexho Food Servs.,* No. Civ. A:196CV143–D, 1997 WL 560917 at *4 (N.D.Miss. Aug.13, 1997) ("Under the circumstances of the case at bar, the court finds that demonstration of the prima facie case, coupled with evidence of the falsity of the proffered reasons for the plaintiff's termination, are insufficient to create a jury question on the issue of age discrimination."); *Goodman v. Super Star Rent–A–Car,* No. 3:96–CV–1092–R, 1997 WL 452737 at *6 (N.D.Tex. July 31, 1997) (Buchmeyer, C.J.) ("In the present case the Court has found that the evidence indicates that [defendant] introduced fabricated justifications for [plaintiff's] discharge"; consequently, "even without evidence of Ellison's racially insensitive remarks, the Court would be entitled to find that a reasonable jury could infer that there was a discriminatory motive in [plaintiff's] firing."); *Deaver v. Texas Commerce Bank, N.A.,* 886 F.Supp. 578, 584 (E.D.Tex.1995) (Schell, C.J.) ("Although Plaintiff raises a genuine issue of fact as to whether Defendants' reasons for discharge were specious, she has failed to raise a genuine issue as to whether her age or gender played a role in her discharge. In fact, the record is devoid of evidence of discrimination.").

It appears to the Court that this important area of discrimination law suffers from a woeful lack of analytical clarity. In an effort to rectify this situation, the Court offers the following general observations.

First, analytical clarity would be considerably promoted by abandoning shorthand references to "pretext" where that term is used to mean anything other than "pretext for discrimination." [3] *See Hicks,* 509 U.S. at 515–18, 113 S.Ct. at 2751–53 (distinguishing "pretext," as shorthand for "pretext for discrimination," from "pretext" in the sense of the employer's asserted justi-

---

**3.** The longer, more precise phrase "pretext for discrimination" is not the only phrase subject to being truncated into a shorter, potentially ambiguous variant. *Compare McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1826 ("respondent must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reason for his rejection were in fact a *coverup for a racially discriminatory decision.*") (emphasis added) *with Louisiana Office of Community Servs.,* 47 F.3d at 1447–48 (finding that plaintiff failed to produce evidence showing "that the explanation was so implausible as to be a cover-up.").

fication simply being false). Another phrase, such as "falsity" or "incredible justification" could profitably be employed to indicate that the employer's stated justification is not true, without yet implying that this falsity gives rise to a reasonable inference of discrimination. On this approach, to say that a plaintiff has shown that the defendant's justification was a "pretext" is necessarily to say that the plaintiff has shown that the justification was both false and gives rise to a reasonable inference of discrimination. On the other hand, to say that the plaintiff has shown that the defendant's justification is "false" or "incredible" is merely to say that the plaintiff has shown that the justification is not true, but without implying whether this falsity licenses a reasonable inference of discrimination.

Unfortunately, needless confusion is generated because the term "pretext" is employed in at least two different senses. Moreover, the equivocation between these two senses of the word "pretext" may well account for the conflicting assessments of the circumstances under which a plaintiff presenting only evidence of "pretext" can survive summary judgment. Insofar as the third prong of the *McDonnell Douglas–Burdine* framework is referred to as the "pretext stage," it is "pretextual" in the sense that plaintiff has the burden to show the falsity of the employer's proffered justification *and* produce evidence permitting a reasonable inference of discrimination. *See Hicks,* 509 U.S. at 515, 113 S.Ct. at 2752; *Rhodes,* 75

F.3d at 994. Yet even after *Hicks* and *Rhodes,* the term "pretext" is still employed in another sense. For example, in *Ontiveros* the court concluded that "[t]here may barely be enough evidence to sustain a finding of pretext" but that there was "insufficient evidence to support a reasonable inference of discrimination." *Ontiveros,* 83 F.3d at 734. This comment is intelligible if "pretext" is understood in the sense of "falsity": the comment then means that although plaintiff has barely enough evidence to show that the employer's proffered justification is *false,* this simple falsity fails to give rise to a reasonable inference of discrimination. But the comment makes no sense on the other interpretation of "pretext": it is contradictory to suppose that plaintiff has given barely enough evidence to show *both* that the employer's justification is false and that a reasonable inference of discrimination thereby arises, but that there is insufficient evidence to support a reasonable inference of discrimination.[4]

Second, analytical clarity would be promoted by explicitly recognizing that the evidence which tends to falsify the employer's proffered nondiscriminatory justification lies along a continuum in terms of its power to imply the existence of discrimination in the absence of any independent evidence beyond the elements of the prima facie case. At one extreme of this continuum is falsifying evidence which is quite barren: it does not by itself support, or even tends to preclude, a rational inference

4. There appears to be a third sense in which the term "pretext" is used. In the third sense, "pretext" means that plaintiff has produced evidence which tends to show that defendant's proffered justification is false, yet this evidence *definitely does not* permit a reasonable inference of discrimination. The assertion in *Walton,* 119 F.3d at 370, that "[t]he plaintiff cannot succeed by proving only that the defendant's proffered reason is pretextual" only makes sense on this third interpretation. After all, if "pretext" is understood in the *Hicks–Rhodes* sense to mean that plaintiff has produced evidence which both shows the falsity of the defendant's proffered justification and permits a reasonable inference of discrimination, the assertion in *Walton* is inaccurate. A plaintiff obviously *can* succeed by proving only this sense of "pretext." If "pretext" is understood to mean "falsity," then again the *Walton* assertion is inaccurate: a plaintiff at least *sometimes* can succeed by producing only evidence which shows the falsity of the defendant's justification. *See Rhodes,* 75 F.3d at 994 ("In tandem with the prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence."). Only if "pretext" is understood in the third sense is the *Walton* assertion accurate.

of discrimination. At the other extreme of this continuum is falsifying evidence which is pregnant with supplemental inferences: in conjunction with the prima facie case but without any other evidence, evidence on this end of the continuum strongly supports an inference of discrimination.

The limiting case on the barren end of the continuum is a case in which the falsifying evidence actually tends to *preclude* an inference of discrimination. Suppose a white female supervisor refuses to promote a black male subordinate. In fact, the reason for her decision is that the black candidate has certain annoying and highly idiosyncratic personal mannerisms which remind the supervisor of a black ex-boyfriend she used to date. Although the memory of this ex-boyfriend is still irritating to the supervisor, she continues to date black men. Not wishing to draw attention to her personal life and unwilling to cast doubt on her ability as a supervisor to make impartial business decisions, she falsely states that she did not promote the plaintiff because he was less well qualified than the white applicant who was promoted. If the passed over black candidate produced such evidence, he would certainly establish the simple falsity of the supervisor's stated, nondiscriminatory justification. Yet this falsifying evidence is quite barren: the fact that the supervisor dates black men tends to preclude an inference of illicit racial animus even while it gives rise to evidence of the falsity of the supervisor's proffered justification.

Some falsifying evidence does not actually preclude a finding of discrimination, but still lies nearer the barren end of the continuum because it does little or nothing to support a reasonable inference of discrimination. For example, the evidentiary record may reveal that, although not articulated by the defendant, the true reason a black candidate was passed up for promotion was the employer's fear that the black candidate's superior accounting skills would inevitably expose the company's acts of embezzlement or tax fraud.[5] *See Rhodes,* 75 F.3d at 994 (citing the case where the embezzlement possibility was first discussed, *Woods v. Friction Materials,* 30 F.3d 255, 261 n. 3 (1st Cir.1994)). Although the inference that an actual criminal may be acting on illicit racial motives is somewhat stronger than the inference that an embarrassed supervisor with memories of an annoying ex-boyfriend is acting on such illicit motives, it is nevertheless too weak an inference to be classified as either rational or reasonable. *See also Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328, 1337 (8th Cir.1996) (although plaintiff's evidence that he was fired due to employer's attempt to cover-up SEC registration violations succeeded in falsifying employer's stated justification, it also undercut inference of age discrimination); *Visser v. Packer Engineering Assocs., Inc.,* 924 F.2d 655, 657 (7th Cir.1991) (en banc) (employer's concession that employee was fired for being a disloyal whistle blower undermines any inference of age discrimination).

At the other end of the continuum is falsifying evidence which strongly supports an inference of discrimination, even in the absence of independent evidence pointing towards that conclusion. Suppose an imperious CEO of a meatpacking company flies out to inspect one of his many far-flung plants. The CEO strides out onto the catwalk and surveys the employees 10 feet below, all of whom are neatly attired in the company's uniform. The CEO points to a black worker and directs the foreman to fire him. The CEO never before met this employee. The CEO's stated

---

**5.** It is important to recognize that a factfinder is not free to hypothesize alternative explanations for the defendant's decision which are not supported by competent record evidence. *See Hicks,* 509 U.S. at 522–23, 113 S.Ct. at 2755–56. But if the existence of a rival hypothesis is sufficiently supported by the record, it may influence the fact finder's assessment of the likelihood that plaintiff was the victim of intentional discrimination, even if the rival hypothesis was not formally "articulated" by the defendant as a legitimate, nondiscriminatory justification. *See id.*

justification is that he saw the plaintiff drop a piece of meat onto the floor, a violation of the sanitary rules. Plaintiff proffers evidence to falsify this justification by providing the depositions of ten eyewitnesses who say that the plaintiff never dropped the meat. However, the plaintiff provides no independent evidence suggesting racial discrimination on the part of the CEO or the company.

In combination with the prima facie case, the falsification of the nondiscriminatory justification here gives rise to a strong inference of discrimination. The CEO never before met this employee, which rules out any competing explanation for the firing such as personal animosity between the plaintiff and the CEO. Since all the workers were neatly attired in the company's uniform, virtually the *only* thing the CEO did know about the plaintiff was that he was black. Once the proffered justification is cast into doubt, a strong inference of racial discrimination arises to explain what otherwise would be a totally arbitrary and capricious decision. This is so even if plaintiff offers no other evidence which would independently suggest the existence of racial discrimination, e.g. offensive jokes, racially charged comments, or disparate treatment of others within the protected class.

The third observation is that falsifying evidence which rises to the level of outright mendacity has considerably more implicative power than falsifying evidence which simply suggests the defendant is mistaken, confused, or not a credible as the plaintiff. The explanation for this increased implicative power is that a lie is often considered evidence of the consciousness of guilt. *See Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 ("The factfinder's disbelief of the reasons put forward by the defendant (*particularly* if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.") (emphasis added); *Casarez,* 193 F.3d at 338 (evidence of falsity of defendant's proffered justifications sufficient to creates jury issue where defendant's accusations of absenteeism and serious "blue-flag" railroad safety violation were contradicted by employer's own records); *LaPierre,* 86 F.3d at 451 (defendant's introduction of "fabricated justifications," in conjunction with other evidence, held sufficient to permit a reasonable inference of discrimination); *Goodman,* 1997 WL 452737 at *6 (where defendant's shifting explanations created a "suspicion of mendacity," a jury issue was raised because the "inconsistency of its allegations and the blatant untruthfulness of many of the facts in [defendant's] response to the EEOC engender reasonable skepticism with the Court as to all of the asserted reasons for [plaintiff's] termination.").

However, there is a crucial difference between an employer who fabricates evidence or otherwise creates a "suspicion of mendacity" and one whose explanation is simply disbelieved by the fact-finder. *See Hicks,* 509 U.S. at 520, 113 S.Ct. at 2754 ("But initially we must point out that there is no justification for assuming (as the dissent repeatedly does) that those employers whose evidence is disbelieved are perjurers and liars.") Unfortunately, there is a regrettable tendency to assimilate all falsifying evidence into the category of outright lies. If not resisted, this tendency can distort the accuracy of the fact-finder's analysis of the implicative power of falsifying evidence. *See* Catherine J. Lanctot, *The Defendant Lies and the Plaintiff Loses: The Fallacy of the "Pretext–Plus" Rule in Employment Discrimination Cases,* 43 HASTINGS L.J. 57, 100 (1991) (conflating falsifying evidence with evidence of lying).

Fourth, the nature of the relationship between the decision maker and the plaintiff is often crucial in assessing the implicative power of falsifying evidence. If there is relatively little interaction between the decision maker and the plaintiff, a strong inference of discrimination may sometimes be raised by falsifying evidence, as the example of the imperious CEO demonstrates. On the other hand, the greater

the interaction between the decision maker and the plaintiff, the greater the chance that the trial record will suggest that personal animosity or other unsavory motivations, rather than discrimination, may be at work. These rival explanations tend to weaken the implicative power of falsifying evidence insofar as they are equally congruent with an incredible justification as the plaintiff's hypothesis of racial discrimination. Moreover, the richer and more extended the interaction between the plaintiff and the decision maker, the more a fact-finder implicitly expects the plaintiff to be able to produce *some* independent evidence of discrimination: some comment, joke, unfortunate office incident or evidence of disparate treatment. Simple falsifying evidence, unaccompanied by even a shred of independent evidence suggesting discrimination, may be relatively weak in the context of a long and extended relationship between the plaintiff and the decision maker.

Other aspects of the relationship between the plaintiff and the decision maker bear on the implicative power of simple falsifying evidence. Most obviously, if the decision maker and the plaintiff are the same race, that fact tends to greatly undermine the inference of racial discrimination even if the decision maker's stated justification is disbelieved. *See Hicks,* 509 U.S. at 508 n. 2, 113 S.Ct. at 2748, n. 2 (although trial court disbelieved the employer's stated justification, inference of racial discrimination was undermined by fact that two members of disciplinary review board were of same race as plaintiff). More subtly, the implicative power of falsifying evidence may be weakened if the same actor hired and fired the plaintiff in a relatively short period of time. *See Brown*

*v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996) (expressing approval of "same actor" counter-inference). "From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'" *Id.* (quoting *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991)).

Finally, it appears that the existence of at least some kind of independent evidence of discrimination can do a lot to enhance the implicative power of simple falsifying evidence. This is so because the evidentiary burden of making out a prima facie case of discrimination is relatively light, and falsifying evidence, other than evidence suggesting outright mendacity, is not especially hard to produce. This means that in many cases, a prima facie case together with simple falsifying evidence will only weakly suggest the existence of discrimination.[6] Any number of employer decisions are unfair, capricious, arbitrary, ill-considered or even irrational. But to conflate these unfortunate decisions with decisions based on proscribed discriminatory animus is to impermissibly convert Title VII into a "just cause" employment statute for protected groups.

## H. *Smith's Falsifying Evidence*

■ Bearing these considerations in mind, the Court turns to an examination of Smith's claims. The record, considered as a whole, is utterly devoid of any independent evidence of racial discrimination. *See Deaver,* 886 F.Supp. at 584. Indeed, Smith does not even bother to identify the race of Ron Hollenback, Debbie Johnson, or Robert Diano, the Equitrac supervisors

---

**6.** The importance of independent evidence of discrimination is illustrated by the *Casarez* decision. It is surprising that the court in *Casarez* never said, although it might have, that the defendant's proffered justifications rose to the level of "fabrications" and created a "suspicion of mendacity." Instead, the court described the defendant's justifications as being merely "false" and "groundless," which, in combination with the plaintiff's

good work record, produced a reasonable inference of discrimination. *See Casarez,* 193 F.3d at 337, 338. The court then took the trouble to justify its decision on alternative grounds by noting that "even if [plaintiff's] showing in this regard were not sufficient," plaintiff had satisfied his burden with copious independent evidence of disparate treatment. *See id.*

who had a role in deciding Smith's employment fate. The most charitable interpretation of Smith's argument is that, in the absence of any direct or circumstantial evidence of discrimination, Smith is attempting to avoid summary judgment by casting doubt on Equitrac's proffered non-discriminatory reason. Unfortunately for Smith, his evidence is not sufficient to create a jury issue as to the falsity of Equitrac's stated justification. Moreover, even if Smith had created a jury issue as to the truth of Equitrac's stated justification, this falsifying evidence, by lying nearer the barren end of the implicative continuum, clearly fails to support a reasonable inference of discrimination.

Smith makes much of the fact that Gerard Roth gave him a generally positive performance evaluation, whereas both Johnson and Diano had a much lower opinion of Smith's technical and social skills. But Johnson and Diano were able to form an opinion of Smith over the course of a year, and their opinions were based at least in part on the fact that Smith repeatedly contacted both Johnson and Diano to voice his numerous complaints. In contrast, Roth was a newly hired supervisor, whose evaluation of Smith was formed after at most one month's contact with Plaintiff. Such evidence does precious little to discredit Johnson and Diano's earlier evaluations, and certainly does nothing to support a reasonable inference of *racial discrimination.*

Similarly, the fact that Riewe has a vaguely positive assessment of Smith and a low opinion of Johnson does little to create a jury issue as to discriminatory motives. Riewe is the Houston receptionist, not one of Smith's supervisors, and she is not in any position to judge Smith's technical skills or accurately assess his ability to work with his supervisors.

Johnson claims that Smith, on account of his poor attitude, was "banned" from working at various law firms, including Lebouef, Lamb; Liddell, Sapp; and Susman, Godfrey. Smith argues that Johnson's claims are "directly contradicted" by the depositions of Riewe and Zeora Jackson. But Riewe merely says that Smith was "quite professional" and helped to restore the professional reputation of Equitrac. Jackson merely says that Smith is well regarded at the firm of Arnold, White, and Durkee. It cannot accurately be said that Riewe and Jackson "directly contradict" Johnson, when neither Riewe nor Jackson makes any mention whatsoever about Smith having been banned from working at Lebouef, Lamb; Liddell, Sapp; or Susman, Godfrey.

The only other argument offered by Smith is that Equitrac backdated the probation memo so that it would appear to have been created the day before the EEOC called Equitrac. But Wooten, the EEOC investigator, does not even remember whether he identified himself when he called Equitrac—he merely says that it was possible he did so. Riewe, who would have received such a call, and is considered by Smith to be a friendly witness, does not recall anyone from the EEOC calling in reference to Smith. Even if Equitrac knew that the EEOC was investigating Smith's allegations as of July 1, Smith fails to offer probative evidence that the probation memo was actually backdated. Smith offers Exhibit "N," an entirely unreadable printout of the "Properties" screen of a computer at Equitrac, which supposedly identifies an earlier date. Even if this opaque exhibit shows what Smith claims it does, Smith fails to explain, in any way, the significance of such a date in the Properties screen. However, the most significant problem is this: even if Equitrac backdated the probation memo to make it appear to have been created before the EEOC called, this one isolated and unfortunate managerial misstep, occurring well after the decision to hire Bozovsky, is not the kind of "fabricated justification" or "mendacious" conduct which can support a reasonable inference of *racial discrimination* in the absence of *any other evidence* save the elements of Smith's prima facie case.

The Court finds that Smith's evidence is not substantial enough to create a triable issue as to the truth of Equitrac's stated nondiscriminatory justification. Even on the assumption that Smith's evidence satisfies the first prong of the *Rhodes* test, it does not satisfy the second prong because it fails to support a reasonable inference of racial discrimination. Other than simple falsifying evidence, Smith offers no other evidence to support an inference of discrimination. Consequently, Smith fails to proffer substantial evidence to satisfy the second prong of the *Rhodes* test. Equitrac's Motion for Summary Judgment as to all of Smith's claims for racial discrimination is **GRANTED**.

## IV. THE RETALIATION CLAIM

Smith also contends that he was retaliated against for filing an EEOC charge complaining of Equitrac's failure to promote him to the position of Senior Field Service Technician. According to Smith, the retaliation consisted of the decision to place him on probation, along with an unarticulated decision, yet to be acted upon, to terminate Smith.

■ To establish a prima facie case of retaliation under Title VII and § 1981, Smith must provide summary judgment proof that: (1) he participated in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal connection existed between the protected activity and the adverse action. *See Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 407–08 (5th cir.1999); *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995) *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992).

■ In order to satisfy the second element of the prima facie case, Smith must show that the adverse employment action amounted to an "ultimate employment decision." "Our court has analyzed the 'adverse employment action' element in a stricter sense than some other circuits." *Burger v. Central Apartment Management, Inc.,* 168 F.3d 875, 878 (5th Cir. 1999). Ultimate employment decisions involve "acts such as hiring, granting leave, discharging, promoting, and compensating." *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997). However, Title VII and § 1981 were not designed "to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis,* 77 F.3d at 781. Consequently, various "interlocutory or mediate" decisions, such as verbal threats of being fired, being placed on "final warning," and supervisor reprimands are not ultimate employment decisions. *See Mattern,* 104 F.3d at 708–09. Being given an undesirable work assignment is not an adverse employment action. *See Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 554 (5th Cir.1997). Nor is a denial of a request for a lateral transfer an adverse employment action. *See Burger,* 168 F.3d at 878.

■ Smith was originally placed on 30 days probation for his insubordinate behavior towards Debbie Johnson. This probation was extended an additional 30 days as a result of Smith's alleged sexual harassment of Cruz. Smith has successfully completed the 60 days of probation and is still employed by Equitrac. Although having been twice place on probation might ultimately influence a later decision to terminate Smith, the probation itself is not an ultimate employment action. See *Burger,* 168 F.3d at 878; *Mattern,* 104 F.3d at 707; *Dollis,* 77 F.3d at 781.

Likewise, the ambiguous written remark by Brad Pomerantz to the effect that it is "not good business decision to terminate Kevin @ this time" is not an ultimate employment decision. In the first place, this comment may have nothing to do with the fact that Smith filed an EEOC complaint, but may instead refer to the belief that Smith's termination would be inadvisable in light of the fact that new clients had just been taken on in the Houston office. Even if the comment is construed as a threat to fire Smith, the threat has never been carried out, and Smith is still employed by Equitrac. See *Mattern,* 104 F.3d at 708–09 (verbal threats to fire a

worker is not an "ultimate employment decision").

Smith essentially concedes that under Fifth Circuit authority he cannot make out a prima facie case of retaliation. He therefore invites the Court to apply the more liberal interpretation of Title VII adopted by the Tenth Circuit. The Court declines the invitation. Because Smith cannot show he has suffered an "ultimate employment decision," he has failed to make out a prima facie case of retaliation. Consequently, Equitrac's Motion for Summary Judgment as to each and all of Smith's retaliation claims is hereby **GRANTED.**

### V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED.** All of Plaintiff's claims for racial discrimination and retaliation under Title VII and § 1981, are **DISMISSED WITH PREJUDICE.** The parties are **ORDERED** to file no further motions on these issues, including motions to reconsider or the like. The parties are also **ORDERED** to bear their own taxable costs and expenses incurred herein to date. In due course, the Court will enter a Final Judgment on all claims dismissed herein. **IT IS SO ORDERED.**